# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROBERT AMBROSE, SCOTT BARNES, RICHARD CHAPMAN, RYAN CIRIGNANO, CHRIS FAUSSETT, MILAN GRUJIC, DAVID KELLER, JOHN KOBEL, DANIEL LAWSON, STEPHEN LUTSK, LORI MAGALLANES, NOAM MEIER, ERIC OSTRANDER, ROBERT OVERTURF, and MIKE WORONKO, on behalf of themselves and all others similarly situated, | Case No.: 4:19-cv-13449<br><br>Hon.  Stephanie Dawkins Davis<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC, | |
| Defendant. | |

Plaintiffs Robert Ambrose, Scott Barnes, Richard Chapman, Ryan Cirignano, Chris Faussett, Milan Grujic, David Keller, Daniel Lawson, Stephen Lutsk, Lori Magallanes, Noam Meir, Eric Ostrander, Robert Overturf, and Michael Woronko, on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this action against General Motors LLC. For this Amended Complaint, Plaintiffs alleges the following based on personal knowledge as to their own acts and on the investigation conducted by counsel as to all other allegations:

## SUMMARY OF THE ACTION

1.      Plaintiffs bring consumer protection, common law, and warranty claims, as well as claims under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, against Defendant General Motors LLC ("GM").

2.      This action arises from the sale or lease of thousands of 2015 – 2016 Chevrolet Colorado and GMC Canyon vehicles throughout Michigan and the United States manufactured by Defendant GM, that are equipped with a defective electrical connection within the torque-sensor harness connector that cause the vehicles to lose power steering while driving under a variety of conditions from reasonable and foreseeable use of the vehicles. The defect manifests with a significant and abrupt reduction of the power steering assist that makes turning of the steering wheel difficult. ("**the Power Steering Assist defect**" or "**the defect**") as indicated below.

3.      The defect affects model year 2015 through 2016 Chevrolet Colorado and GMC Canyon vehicles sold or leased to consumers in the United States, including Plaintiff's vehicle. All Class Vehicles share the same dangerously defective condition that GM failed to disclose to Plaintiff, consumers, and each Class Member.  General Motors previously recalled model year 2015 Chevrolet Colorado and GMC Canyon vehicles manufactured January 6, 2015, to March 17, 2015, stating that a poor electrical connection within the steering gear connector may cause a       loss       of       power       steering       assist.       *See*

https://www.nhtsa.gov/vehicle/2015/CHEVROLET/COLORADO/PU%25252FCC/4WD#recalls (last accessed Oct. 28, 2019) (Exhibit 1).

4.     General Motors acknowledged in these recall documents that the loss of power steering creates significant safety risks: "If power steering assist is lost or reduced, steering control can still be maintained, but would require an increased steering effort, particularly at lower speeds, which presents a greater risk of a crash." *See* GM Recall Bulletin, Product Safety Recall, Bulletin No. 15595A (Exhibit 2).

5.     General Motors has not disclosed the existence of the defect in model year 2015 and 2016 Chevrolet Colorado and GMC Canyon vehicles manufactured before January 6, 2015 or after March 17, 2015. "**Class Vehicles**" in this Amended Complaint refers to 2015 – 2016 Chevrolet Colorado and/or GMC Canyon vehicles purchased or leased in the United States and that were manufactured before January 6, 2015 or after March 17, 2015.

6.     Plaintiffs and Class Members purchased GM vehicles fitted with a defective steering gear torque sensor cover assembly that causes them to abruptly lose the power steering assist.  This is a major safety concern because drivers have reported that the defect can cause a loss of control that may require a restart to temporarily ameliorate the issue.

7.     GM sold, leased, and continues to sell and lease the Class Vehicles despite its awareness of the defect. GM chose and continues to choose financial gain

at the expense of consumers by concealing and omitting a disclosure of this critical powertrain component and potential safety hazard to consumers who purchase or lease Class Vehicles.

8.     Despite its knowledge, GM has failed to recall the inherently dangerous electronic power steering assist torque sensor or reimburse vehicle owners for the inevitable failure of this critical part.

9.     Plaintiffs and Class Members have suffered harm because of GM's decision not to disclose the defect by overpaying for their vehicles and by paying significant sums for GM to attempt, and fail, to properly diagnose and repair their vehicles that exhibit the Power Steering Assist defect.

10.    GM has long known of the defect and that the Class Vehicles' electronic power steering assist torque sensor is not fit for its intended purpose, as detailed at length in the factual background section below.

11.    GM actively concealed and/or failed to notify an adequate number of the affected public of the existence and nature of the defect and of the safety hazard created by the defect. GM has failed to recall the Class Vehicle to replace the steering gear torque sensor cover assembly; it has not offered to replace the steering gear torque sensor cover assembly to its customers not included in the recall free of charge; and it has not offered to reimburse owners, present or past, who have incurred costs relating to diagnosing and repairing issues arising from the Power

Steering Assist defect. GM's conduct violates well-established consumer protection laws throughout the country, and constitutes a continuous breach of its warranties to Plaintiffs and consumers in the United States, and constitutes fraudulent concealment under common law.

12.    Plaintiffs bring this action on behalf of themselves and all those similarly situated ("Class," "Class Members," "Consumers," "Owners") for GM's breach of its warranties across the United States and GM's unfair and deceptive trade practices in violation of the consumer protection laws of various state laws.

13.    On behalf of the Class Members they seek to represent, Plaintiffs seek an award of damages in excess of $5,000,000, including the costs of inspecting and replacing the defective electronic steering gear torque sensor cover assembly and equitable relief, including an order requiring GM to adequately disclose and repair the defect. Furthermore, Plaintiffs seek damages, injunctive and declaratory relief, restitution, disgorgement of profits, attorneys' fees and costs, punitive damages, and the repair of, replacement of, or refund of money paid to own or lease all Class Vehicles.

**PARTIES**

14.    Plaintiff Robert Ambrose is a citizen of New Jersey and resides in Rocky Hill, New Jersey.

15.    Plaintiff Scott Barnes is a citizen of Florida and resides in St.

Petersburg, Florida.

16.     Plaintiff Richard Chapman is a citizen of Washington and resides in Kingston, Washington.

17.     Plaintiff Ryan Cirignano is a citizen of South Carolina and resides in Myrtle Beach, South Carolina.

18.     Plaintiff Chris Faussett is a citizen of California and resides in Santa Clarita, California.

19.     Plaintiff Milan Grujic is a citizen of Illinois and resides in Willow Springs, Illinois.

20.     Plaintiff David Keller is a citizen of South Carolina and resides in Chapin, South Carolina.

21.     Plaintiff John Kobel is a citizen of New York and resides in Wantangh, New York.

22.     Plaintiff Daniel Lawson is a citizen of Indiana and resides in Jasper, Indiana.

23.     Plaintiff Stephen Lutsk is a citizen of California and resides in West Hollywood, California.

24.     Plaintiff Lori Magallanes is a citizen of California and resides in Temple City, California.

25.     Plaintiff Noam Meir is a citizen of Connecticut and resides in Fairfield,

Connecticut.

26.     Plaintiff Eric Ostrander is a citizen of North Carolina and resides in Gastonia, North Carolina.

27.     Plaintiff Robert Overturf is a citizen of South Dakota and resides in Rapid City, South Dakota

28.     Plaintiff Michael Woronko is a citizen of Michigan and resides in Kent County, Michigan.

29.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, Detroit, Michigan 48243. Defendant designs, manufactures, and sells automobiles throughout the United States, including in the State of Michigan, under the brand names Chevrolet, GMC, and Cadillac. GM does business in Michigan, advertising, distributing, and selling its vehicles through its dealer network and other outlets in the State.

## JURISDICTION AND VENUE

30.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state from GM, the number of proposed Class Members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. §

1332(d)(2)(A).

31.     This Court has personal jurisdiction over GM because GM is headquartered in Michigan and has purposefully availed itself of the privilege of conducting business activities in the State of Michigan.

32.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because GM's corporate headquarters is located in Detroit, MI, a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated within this District, and GM has caused harm to Plaintiffs and Class members residing in this District. Moreover, GM has marketed, advertised, sold, and leased the Class Vehicles within this District.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

33.     GM manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Chevrolet brand. This lawsuit concerns model year 2015 through 2016 Chevy Colorado and GMC Canyon vehicles sold or leased to consumers in the United States, including Plaintiff's vehicle.

34.     The GMC Canyon is virtually a twin to the Chevrolet Colorado. Canyon and Colorado were redesigned for 2015. They carried over to the 2016 model year mostly unchanged. https://www.newcartestdrive.com/reviews/2016-gmc-canyon/ (last visited Oct. 22, 2020) (Exhibit 3).

35.     The curb weight of the Class Vehicles ranges from approximately 3920

lbs                              to                   4,500                    lbs.

https://media.gmc.com/media/us/en/gmc/news.detail.html/content/Pages/news/us/e

n/2014/Sep/0914-midtruck/0921-canyon-specifications.html (last visited Oct. 22,

2020) (Exhibit 4). The Class Vehicles weigh more than the average weight of a large

car,    and    power    steering    is    thus    crucial    to    vehicle    control.

https://autoshopaccessories.com/how-much-does-a-car-

weigh/#Summary_Table_of_Weights_by_Category (last visited Oct. 22, 2020)

(Exhibit 5).

36.     GM represented in its marketing materials that:

The 2015 Canyon has a tight turning radius of approximately 41 feet
(12.6 meters), making it easier to maneuver when parking or backing
into tight spots. And features like electric power steering provide easier
maneuverability in tight situations.

https://media.gmc.com/media/us/en/gmc/news.detail.html/content/Pages/news/us/e

n/2014/Jul/0721-gmc-canyon.html (last visited Oct. 22, 2020) (Exhibit 6);

Colorado also features the segment's first application of electric power
steering, which enhances efficiency by avoiding the energy used by
what conventionally is an engine-driven feature. The Colorado has a
short turning radius of 41.3 feet (12.6 meters), enabling easier turning
in tight areas such as city streets or backing a trailer into a camping
spot.

https://media.gm.com/media/us/en/chevrolet/vehicles/colorado/2015.html        (last

visited October 22, 2020) (Exhibit 7).

37.     GM has made the following representations regarding the centralized

and common development and testing of vehicle parts, including steering parts:

> A centralized organization is responsible for many of the non-visible
> parts of the vehicle such as steering, suspension, the brake system, the
> heating, ventilation and air conditioning system and the electrical
> system. This team works very closely with the global architecture
> development teams around the world, who are responsible for
> components that are unique to each brand, such as exterior and interior
> design, tuning of the vehicle to meet the brand character requirements
> and final validation to meet applicable government requirements.
>
> * * *
>
> Testing includes pre-production testing of vehicles as part of
> certification and in-use testing of customer vehicles at specified
> mileages.

*See* GM's 2014 Form 10k,

https://www.sec.gov/Archives/edgar/data/1467858/000146785815000036/gm2014

10k.htm (last visited October 22, 2020) (Exhibit 8).

38.     Electric power steering is a relatively new development that

automakers have adopted in part to increase fuel mileage. Electric power steering

differs from hydraulic power steering by using an electric motor rather than a

hydraulic system to multiply force applied to the steering wheel inputs to the

vehicle's steered road wheels.

39.     To provide steering assistance, an electric motor mounted to the side of

the rack housing drives a ball-screw mechanism via a toothed rubber belt. The screw

engages a spiral cut in the outside of the steering rack. A torque sensor attached to

the pinion shaft signals a control computer when to provide assistance.

40.     On January 27, 2016, GM notified the Office of Defects Investigation (ODI) that it would conduct Safety Recall 16V054 to address a loss of electric power steering caused by a poor electrical connection within the torque-sensor harness connector in 2,988 Model Year (MY) 2015 Colorado / Canyon vehicles built between January 6, 2015 and March 19, 2015. General Motors determined that a defect which relates to motor vehicle safety existed in certain 2015 Chevrolet Colorado and GMC Canyon vehicles, finding that these vehicles may experience loss of power steering assist at startup, or while driving, due to a poor electrical connection within the torque-sensor harness connector. Dealers were instructed to replace the steering gear torque sensor cover assembly. *See* GM Recall Bulletin, Product Safety Recall, Bulletin No. 15595A (*See* Ex. 2).

41.     In or around June 2018, GM created a customer satisfaction program, which is a type of silent recall, for approximately 6,261 2015 model year Chevrolet Colorado and GMC Canyon vehicles. GM acknowledged that these vehicles also contained problems with the torque sensor:

> [M]ay have been built with a connector between the electric power steering motor and torque sensor that has a potential for fretting corrosion.  If this condition exists, power steering may be lost, and the driver may experience unanticipated increased steering effort as the vehicle reverts to manual steering. A chime will also sound in the vehicle, and a "Service Power Steering" message will appear on the

11

> Driver Information Center (DIC). Manual steering functionality will be maintained but will require additional effort, particularly at lower speeds.

*See* Customer Satisfaction Program 18027 Power Steering Loss of Assist (Exhibit 9).

42.     On or around May 23, 2019, the National Highway Transportation Safety Administration ("NHTSA") Office of Defect Investigation ("ODI") opened a Recall Query to assess the scope of the earlier recall (Recall 16V054) and to identify the causes and effects of electric power steering failure in all 2015 and 2016 Class Vehicles. NHTSA ODI noted that subsequent to the earlier recall, it had received 50 Vehicle Owners Questionnaires (VOQ) reporting a loss of electric power steering in Model Year (MY) 2015 Colorado and Canyon vehicles, built outside the recall scope, that report a loss of power steering assist while driving under a variety of conditions. *See* Recall Query Letter and ODI Resume (Exhibits 10 and 11).

43.     GM has long been aware of problems with its electric power steering parts, and has had numerous prior recalls of approximately 1.9 million vehicles for similar electric power steering parts in other vehicles just prior to the introduction of the Class Vehicles:

> In the three months ended March 31, 2014 approximately 1.9 million vehicles were recalled to replace either the power steering motor, the steering column, the power steering motor control unit or a combination of the steering column and the power steering motor

control unit as the electric power steering could fail under certain circumstances — model years 2004–2006, 2008–2009 Chevrolet Malibu, model years 2004–2006 Malibu Maxx, model years 2006–2010 HHR, model years 2005–2010 Cobalt, model years 2008–2009 Saturn Aura, model years 2003–2007 ION, model years 2007–2010 Pontiac G5, model years 2005–2006, 2008–2009 G6 and model years 2005–2006 Pursuit and G4. We recorded approximately $340 million in Automotive cost of sales to repair these vehicles.

*See* GM's 2014 Form 10k, https://www.sec.gov/Archives/edgar/data/1467858/000146785815000036/gm2014 10k.htm (*See* Ex. 8).

44.     GM's previous recalls for loss of electric power steering in the vehicles listed in the preceding paragraph bear a striking resemblance to the steering defect in the Class Vehicles, including the defective torque sensor assembly:

Your vehicle equipped with EPS may experience a sudden loss of power steering assist that could occur at any time while driving. If the power steering assist is lost, a message is displayed on the Driver Information Center and a chime sounds to inform the driver. Steering control can be maintained, as the vehicle will revert to a manual steering mode, but would require greater driver effort at low vehicle speeds, which could result in an increased risk of a crash.

What will we do? Depending on whether you already had some parts on your steering system replaced, your GM dealer will replace the torque sensor assembly or the power steering motor controller unit, or both.

*See* https://www.nhtsa.gov/vehicle/2009/CHEVROLET/MALIBU#recalls (Exhibit 12); *see also* https://static.nhtsa.gov/odi/rcl/2014/RCONL-14V153-0123.pdf (last accessed Oct. 22, 2020) (Exhibit 13).

45.     GM similarly recalled the 2014 – 2016 Chevrolet SS for a defect in its

electric power steering, which also bore a striking resemblance to the steering defect in with the Class Vehicles, including the defective torque sensor assembly:

> General Motors LLC (GM) is recalling certain 2014-2016 Chevrolet SS vehicles. Corrosion of the connector between the electric power steering module and the torque sensor connector may cause a loss of electric power steering assist.

See   https://www.nhtsa.gov/vehicle/2014/CHEVROLET/SS#recalls   (last accessed Oct. 22, 2020) (Exhibit 14).

46.    GM's partial recall Bulletin No. 15595A is an incomplete affirmative disclosure from which a plausible inference can be drawn – that because other older GM vehicles suffered from well-publicized electric power steering defects as detailed above, a reasonably prudent consumer might expect that GM had rectified this issue in the newer models, including the VIN range that was outside of GM's recall Bulletin No. 15595A.

## THE DEFECT

47.    GM, through its dealerships, employees, agents, and servants, failed to disclose to Class Members and the public that the Class Vehicles contain defective electronic power steering assist torque sensor that renders the vehicles not fit for their intended purpose. This omission allowed Defendant GM to place the Class Vehicles in commerce and profit from their sales. However, GM knew from the time of manufacture that the electronic power steering assist torque sensor contained a dangerous, inherent defect from the point of manufacture that caused the Class

Vehicles to exhibit the "Power Steering Assist" defect.

48.    GM's notice of the defect derived from, among other things, GM's own knowledge about the material, design, and manufacture of the part, pre-production testing, preproduction design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, feedback, both directly and through its dealers, from its customers during repairs, complaints in the National Highway Transportation Safety Administration ("NHTSA") database, online complaints in web forums and social media that are monitored by GM, news reports, and prior recalls including those detailed above relating to electric power steering parts including the torque sensor.

### A.    GM knew the defect through multiple consumer complaints.

49.    One forum titled "Power Steering Failure" on the website https://coloradofans.com has dozens of complaints from GM consumers about the defect.  *See*  https://www.coloradofans.com/threads/power-steering-failure.241338/ (last accessed October 23, 2020) (Exhibit 15).

50.    Another forum titled "Steering Problems of Chevrolet Colorado – part 1" on the "Car Problems" website similarly has dozens of the complaints from GM consumers                about                the                defect.                *See*

15

http://www.carproblemzoo.com/chevrolet/colorado/steering-problems.php        (last

accessed October 23, 2020) (Exhibit 16).

**B.      GM knew of the defect through NHTSA VOQs.**

51.     GM, through its dealerships, agents, servants, and employees, was also

put on actual and/or constructive notice of the Steering Power Assist defect from

GM's internal customer assistance inquiry records and National Highway and

Traffic Safety Administration Office of Defects Investigation (NHTSA-ODI)

reports pre-dating the sale of the vehicles. The NHTSA-ODI website allows

consumers to identify and report problems with vehicles, tires, equipment or car

seats. *See* https://www.nhtsa.gov/recalls (last accessed August 2, 2019) (Exhibit 17)

("What happens to my complaint? Your complaint fuels our work. … Your

complaint will be added to a public NHTSA database …. If the agency receives

similar reports from a number of people about the same product, this could indicate

that a safety-related defect may exist that would warrant the opening of an

investigation.").

52.     The Office of Defects Investigation reviews and analyzes complaints to

determine whether to issue recalls.  The Vehicle Safety Complaint filing form

specifically includes required fields for the name, telephone number, and email

address for the complainant, and the VIN number for the vehicle (which are

apparently     tested     by     an     online     database).     *See*     https://www-

odi.nhtsa.dot.gov/VehicleComplaint/ (last accessed August 2, 2019) (Exhibit 18).

NHTSA-ODI does not share complainants' personal information with the general

public, and a complaint is added to a public NHTSA database only after it removes

all information from complaint fields that identify a complainant. *See*

https://www.nhtsa.gov/recalls (last accessed August 2, 2019) (*See* Ex. 17).

53.    NHTSA-ODI specifically states on its website that:

> Government analysts review each complaint in a timely fashion. If
> warranted, the Office of Defects Investigation (ODI) will open an
> investigation to determine if a safety defect trend exists. Some of these
> investigations result in safety recalls.
>
> While you may or may not be contacted by a NHTSA-ODI investigator
> to clarify the information submitted, all reports are reviewed and
> analyzed for potential defects trends.

Thus, NHTSA-ODI complaints are made by individuals who must identify

themselves and enter detailed contact information and an accurate VIN number, and

these complaints are reviewed and analyzed by the federal government.

54.    NHTSA-ODI reports scores of complaints consistent with the

symptoms of the Steering Power Assist defect in Class Vehicles and multiple similar

complaints for similar 2015 – 2016 Colorado and Canyon vehicles. These consumer

complaints filed with the NHTSA are delivered to GM, reviewed by GM, and

analyzed by GM's engineers. GM received and was aware of these consumer

complaints. True and accurate copies of these complaints are attached hereto as

Exhibit 19. A sampling of the complaints are set forth below.  Combined, the reports

illustrate the safety risks from the defect and that replacement parts were unavailable

or backordered for consumers seeking repairs:

---

**May 10, 2015 (NHTSA ID#10715570); 2015 Chevrolet Colorado**

"Was stopped at a red light. Warning sound came and instrument cluster mentioned stabilitrak and power steering fault, drive with care. Had no power steering for rest of trip to work. Had this [have] happened in traffic and in a turn I could have easily hit a car as it was extremely difficult to turn. Turned off vehicle and started back up and everything was fine."

---

**June 26, 2015 (NHTSA ID#10730588); 2015 GMC Canyon**

"1. Purchased this vehicle from dealership.

2. On date I listed while driving a straight rural road (about 15 minutes of driving) the 'service' indicator light came on with message stating that power steering was not working, along with several other indicator lights- tire pressure/ traction control???

3. My concern- if you are going straight car/truck can be steered with effort. It becomes almost impossible for me (6'0 180 lbs) to steer when turning or maneuvering. I hope the danger is apparent ot you from what I have stated. When I got to my destination (drove slow and very controlled on rural roads, 15 minutes) I did some errands with the plan to get the truck in for service. When I came out to leave, started truck- everything was back to normal- like nothing ever happened.

4. Today, June 26, out doing errands- same scenario occurred- no warning except for 'service' indicator in middle of my drive- no power steering. Again-very difficult to steer and maneuver. Everything is fine, back to normal, when I stopped and re-started truck.

5. GMC said their power steering is new on [this] vehicle- 'electronic' no belt, etc.

6. Almost seems like a computer issue, like a re-boot on the system, when the engine is turned off and then re-started.

7. If this situation would occur to other- people could die as the result of accidents. Please check into this and see if there be a problem with the electronic steering/ computer on the GMC Canyon Chevrolet Colorado. Updated 10/31/2017*CN"

---

**July 3, 2016 (NHTSA ID#10882340); 2016 GMC Canyon**

"On 12/29/2015 at approximately 8:00am on a clear bright day I was driving near my home returning from [an] errand. I was approximately 90% through a slight right turn

---

when the electronic power steering went out causing the vehicle to leave the road, continue down a ditch hitting a concrete drive, concrete mailbox and a power pole. The vehicle was totaled and I had soft tissue bruising, cuts, and abrasions."

### December 8, 2016 (NHTSA ID#10933834); 2016 Chevrolet Colorado

"TL* The contact owns a 2016 Chevrolet Colorado. The contact stated that the steering wheel locked more than twice. The dealer was notified each time, but was unable to provide a solution to prevent the failure. The contact experienced the failure again and was able to receive roadside assistance. The manufacturer was notified of the failure and provided no solution. The vehicle was not repaired. The approximate mileage was 2,500."

### January 13, 2017 (NHTSA ID#10944974); 2015 GMC Canyon

"The power steering assist has shut down three times making it very hard to [steer]. This last time it happen[ed,] I was in heavy traffic and almost wrecked. My wife is 4'11" and 95 pounds and is scared to drive the truck. I am too now since the event yesterday. The truck was taken to the dealer for the third time yesterday which I was close to when it happened yesterday. I drive it without the power assist to make sure they understand how hard it is to drive. It was in the dealer 3 or 4 weeks ago for a recall for this problem. After 3 times, I nor my wife want to drive the truck again. If it keeps happening we will eventually wreck. The truck has only approximately 16,000 miles on it."

### April 5, 2017 (NHTSA ID#10970802); 2015 Chevrolet Colorado

"On 2/9/17, I had the steering recall work performed. On my way home while making a right, steering completely locked. I crossed into the opposite lane until the steering freed up. I drove a few more days without issue but I did notice a knocking sound coming from the front. The following week there were a few times where the steering did not immediately respond. On 2/22/17, I went back to the dealer and they said that they could not duplicate, but they did secure a loose front fog light to fix the knocking. I picked up the tru[c]k and initially did not hear any more knocking; however, the knocking was still there when on rough surfaces. I continued to experience the knocking and subtle issues where the steering did not immediately respond when corning. Around March 18th, I again started to experience the locking. On March 20th, it happened approximately 20 times or more. On 3/22/17, I was back at the dealer where they were able to reproduce the issue. I was told that there were no codes in the system and I saw no lights on the dash. This time the[y] performed the following: '33967 steering assist motor binding, high effort 3.20 No DTC, Scan Data Normal, circuit test normal, replaced steering gear, perform EPSCM set up, perform front end alignment. Verify repairs.' On 3/23/17, I picked up my truck and it seemed as good as new. Even the knocking went away. On 4/2/17, I experienced 2 times back to back in a parking lot where the steering locked and I came close to hitting a parked car. On 4/3/17, on my way to the dealer, it again locked. Turning into the dealer parking lot, there was the subtle hesitation. The tech drove it and could not make it happen. I then

went with the tech and I could not make it happen in the 15 minutes we were out. At this point, I'm not sure when it will happen again and I feel that this has been and is a safety issue."

### June 12, 2018 (NHTSA ID#11101374); 2015 Chevrolet Colorado

"Power steering fails at random times at any speed creating extremely dangerous driving situations in a relatively large truck. It is difficult for me (A 189 pound man) to control the vehicle without the steering assist and nearly I had a serious accident as a result. There was a partial GM recall on 2015 Chevrolet Colorados for exactly this reason (recall #15595A). However, the dealer said this did not apply to my VIN and expects me to pay 1,700 dollars to replace a flawed system with the same flawed system. The problem I experience is identical to the issue described in the recall; on top of this, my vehicle only has around 43,000 miles. Loss of power steering given my vehicles low mileage, good [maintenance] record, and that I have never placed any significant mechanical strain or been in an accident clearly indicates to me, particularly given the strikingly applicable recall I mentioned, that this is a manufacturing error. I have found literally dozens upon dozens of similar complaints on forums, including one accident that resulted from this. I frankly am very frustrated with GM and feel that if their shoddy design is putting my and others lives in harms way, at least they should pay to replace the system with the same crummy system."

### November 29, 2018 (NHTSA ID#11154786); 2016 Chevrolet Colorado

"Power steering failed completely while in motion on the interstate going 65 mph in Glenwood Springs, CO. Was very scary and could have caused a serious accident. Chevrolet dealership took 3 weeks to find problem. They are not able to warranty. Chevrolet corporate does not care at all, actually almost impossible to get ahold of anyone there."

### April 7, 2019 (NHTSA ID#11194475); 2015 GMC Canyon

"Power Steering fails. Alarms steering failure, stability errors and that steering may be difficult. This is the exact same error and the recall 16V054000. GMC claims that my vehicle is not one of the effected vehicle[s]. Well, [it] obviously is and GMC is trying to minimize the total number of recalls. The dealer wants a huge amount of money to troubleshoot and possibly repair issue, but they also claim no recall so no help from GMC. Th[is] happens at both freeway speed and crawling in traffic. Steering wheels jerks then alarms go off, my wife will no longer drive this vehicle as she cannot turn the wheel when this happens and she almost crashed. I have also almost crash[ed] when this happened and I was caught by surprise and almost did not make a turn and hit the curb. Alarms will reset if I stop and turn off the vehicle then restart. But that's not really possible at freeway speeds or in local traffic. GMC is hiding the fact that the recall 16V054000 is larger than they claimed. This safety issue needs to be addressed ASAP before someone is injured or killed because of a known issue [that] GMC will not own. This has happened at least 5

times now and after contacting GMC they claimed its not [their] problem and I need to pay to have the truck repaired. First happened December 2018 when GMC was contacted and has [now] happened 5 more times. The last time on March 31, 2019 it happened twice in less than ½ hour. So the issue is getting worse. Please let GMC know they missed a few trucks with their recall dates."

### May 6, 2019 (NHTSA ID#11205741); 2015 Chevrolet Colorado

"TL*The contact owns a 2015 Chevrolet Colorado. While operating the vehicle, the power steering intermittently malfunctioned and caused the steering wheel to become very difficult to turn in either direction. On April 22, 2019 my son was driving the vehicle and hit a deer due to the fact the power steering had failed. He could not steer it quick enough to avoid impact with the deer. So the truck has left front bumper damage and suspension damage but it was still drivable. The failure was diagnosed and repaired. To fix steering they replaced the complete power steering module with gear for $1,944.04. The manufacturere was not notified of the failure. The local dealer Denecker Chevroloet, 510US-7, Middlebury, VT) was notified, but no assistance was offered. The failure mileage was 65,000. *BF*JB"

### July 10, 2019 (NHTSA ID#11230765); 2015 Chevrolet Colorado

"February 2017 (34,141 Miles)- Lost power steering suddenly while driving at highway speed w/ 'power steering service' warning. Pulled over w/ difficulty, shut down, restarted, problem seemed to disappear. Had code red at local chevy dealership, no charge, advised to return if issue recurred. May 2017 (38494 miles)- same issue returned to same chevy dealership, diagnosed 'poor connection in torque sensor harness.' Installed SL-N-Housing kit using N-lubricant and statesd it was covered by warranty. July 2019 (71474 miles)- Identical issue (driving, highway speed, power steering lost w/ 'power steering service' warning, and additionally traction control loss warning). Pulled over w. difficulty. Shutdown, issue resolved on restart. Same day- went to chevy dealer, told to return the next am due to scheudling. 10 July 19- returned to same Chevy dealer. After 2+ hours of inspection was informed the sensor could not be replaced alone and that a large portion of the steering column had to be entirely replaced due to the failing ' torque sensor harness' w/ repairs/ parts estimated at over $2000.00. When I suggested that this may be a recall issue I was informed that the month my 2015 was built was not part of the recall even though the problem is essentially the same. Note: the above vehicle is and has been almost exclusively driven on well maintained roads w/ noa aggressive off road use/abuse."

### July 11, 2019 (NHTSA ID#11231178); 2016 Chevrolet Colorado

"I was driving my Chevy Colorado in a marine port in high traffic. My truck dinged as two service codes came across my dash. Service-power steering drive with care and service stabilitrak. The most terrifying thing about this happening is the steering wheel pretty much locks and becomes highly highly difficult to get to a safe place or pull over. I was

almost hit going throuhg a intersection. I stop, turn the truck off. Turn it back on. Magically the steering works again. I go to drive to my shop to have them have a look. My power steering goes out again ! No recalls present over a 2400 dollar repaid. How can this keep happening and chevy won't fix this problem !"

### September 17, 2019 (NHTSA ID#11256451); 2015 Chevrolet Colorado

"While operating my Colorado at 45 mph the power steering went out causing me to lose all control of the truck and almost getting into an accident. I restarted the truck and it was able to take my Colorado to dealer which found that the electronic steering sensor needed to be replaced at $2800. Checking the internet I found a growing number of similar complaints of Colorado owners losing control of their vehicles while the car is in motion. This is extremely dangerous and I want to warn everyone to get this checked as a safety issue. Chevrolet has opened an investigation [XXX]. Extremely dangerous especially depending on the driving experience of the driver as these vehicles are generally purchased for new young drivers. I will continue to investigate and suggest anyone reading to do your homework as well your life or in my case, my kids life may depend on it. Information redacted pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. 552 (B)(6). *TT"

### September 17, 2019 (NHTSA ID#11256267); 2016 GMC Canyon

"While driving I lost power steering causing the truck to pull into next lane. [Luckily] no other vehicle was near. GMC dealership said the[y] are not aware of any issues with steering gear box for the 2016 canyon. This is very dangerous as I see other complaints. It needs to be looked into. And costly $1900 dollar repair."

### October 24, 2019 (NHTSA ID#11270835); 2016 Chevrolet Colorado

"While driving at any rate of speed, in any condition, my power steering will suddenly disable, the gas/ acceleration stops working and the stabilitrak light come son. This has happened while backing out of a parking spot (after sitting all day long at work), it has happened going 35 mph on a sunny day and another time going 45 mph in the rain (happened last week). Fortunately, I have always been on a straight street when it has happened. It is very difficult to steer if not impossible. If this happens while I'm on a curve it could result in a very bad accident. My wife says she will no longer drive it. The dealership told me they can't get it to duplicate while driving so they cannot help me. I only have 36, 098 miles. I took it to the chevy dealership at only 28 miles past my warranty coverage. GM needs to recall this immediately. I've been loyal to Chevy. They should be loyal in return and fix this issue."

### January 15, 2020 (NHTSA ID#11299509); 2015 GMC Canyon

"While driving on the highway at 65 mph the power steering and stability control went out. This resulted in significantly reduced steering and reduction in control of the vehicle. I was passing a tractor trailer at the time in a slight turn in the road. I came within inches of hitting the tractor trailer and significantly injuring myself, my child, and damaging the vehicle. I was able to eventually pull off the road and restart the vehicle. The problem corrected itself after restart. I understand this is a known issue with the 2015 GMC Canyon and GMC only decided to recall some of the vehicles. Why would the NHTSA allow this serious safety issue to go uncorrected?"

**February 9, 2020 (NHTSA ID#11308019); 2015 Chevrolet Colorado**

"The power steering would randomly turn off while driving it would become very difficult to steer the truck, and I almost caused several accidents. Restarting the vehicle would temporarily bring the steering back to normal. As time went on, this would happen more and more frequently. Chevrolet had a recall on a small amount of trucks, but my VIN wasn't included in the recall (for reasons that Chevrolet wouldn't disclose to me) so I had to pay $2300 out of pocket for a new steering gear set up. Chevrolet should do the right thing and recall or at least offer to fix all 2015 Colorados and Canyons with this problem. If a younger, or inexperienced driver runs into a problem where the power steering goes out without warning, someone can get injured or killed. I know I am not the only person that was affected by this. This problem happened in many situations, while on the highway, while in parking lots, while mid turn…it was very scary."

**March 4, 2020 (NHTSA ID#11315960); 2016 Chevrolet Colorado**

"This is the second occurrence of the problem I am going to describe. What occurred today was a loss of power steering while taking a right turn off of a side street onto a cross street into traffic. It was extremely difficult to complete the turn and caused a dangerous situation where I almost crossed the lane into oncoming traffic. Upon straightening the vehicle out I noticed a electronic stability control warning message, then as I continued to drive to look for a safe place to stop, a no power steering message came on stating to drive safely or something to that effect. After I found a location to park, I repeatedly turned the car off and on in hopes of re-setting the systems. This did not have any [e]ffect on the faults and the messages remained. I also noticed when I reversed the vehicle, the back up screen gave me a message that there are no projection lines. I slowly drove the vehicle home the rest of the way while "muscling" it around turns. Approximately thirty minutes after I had arrived home, I restarted my vehicle and all systems worked correctly with no warning messages displayed. I had mentioned this was the second time this has occurred, the first time was about three months prior to this incident. I thought that I had accidentally turned the electronic stability control off or something. This instance the vehicle reset after I turned it off and restarted it. To note is this vehicle is extremely well maintained and in very good condition."

> ### July 21, 2020 (NHTSA ID#11340607); 2015 Chevrolet Colorado
>
> "My Colorado has been having a problem where my power steering cuts out while driving and on startup, I researched and it seems to be a common problem and a recall, I contacted my local dealer, explained to them what was going on and I was told that it did have the recall for my exact issue but that it had already been fixed. It absolutely has not or needs to be fixed again. [It's] an extreme hazard it happens daily at this point and I really do not know what else to do. I do not know who did the repairs the first time I bought the truck used but I was told the problem has been taken care of but it has not. Please help thanks."

> ### October 16, 2020 (NHTSA ID#11364679); 2016 Chevrolet Colorado
>
> "While the vehicle remained in motion taking a turn on a roundabout, the vehicles power steering and stabilitrak suddenly turns off causing the vehicle to become very difficult to steer and near impossible to complete the turn. The situation happened twice in roundabouts in the past couple months. One of the times this happened my wife was driving while my two young children were in the vehicle. She described hitting the curb, because of lack of arm strength to pull the wheel. The issue resolves when you can safely park and restart the vehicle. After taking it to the dealer it was confirmed there was an electrical issue with the 'steering gear pinion' and it appears to be a known safety issue with Chevy Colorado's. The dealer mentioned the cost to replace this electrical component including labor was an upwards of 1800 dollars. For 2015 model years it appears 3000 vehicles were recalled for this exact issue, however a broader recall was not extended to the 2015 model year. After contacting GM it was expressed that they would not cover my vehicle under this recall at this time. I was charged for the diagnostic fee to determine the cause of issue."

**C.** **GM systematically refuses to disclose the known defect and refuses to honor its warranties to Class Members by repairing the known defect.**

55.     Class Vehicles were sold with a 3-Year / 36,000 Mile bumper-to-bumper warranty and a 5-Year / 60,000-Mile Powertrain Limited Warranty.

56.     It is commonly understood that the electronic power steering torque assists sensor in passenger vehicles like the Class Vehicles are meant to last the lifetime of the vehicle. *See, e.g.,* Valerie Johnston, "How Long Does a Power

Steering Pump Last?", Your Mechanic, Jan. 15, 2016, available at https://www.yourmechanic.com/article/how-long-does-a-power-steering-pump-last (last accessed August 02, 2019) (Exhibit 20). Reasonable consumers expect that a vehicle's electronic power steering torque assist sensor—which isn't part of regular maintenance and service—will last the lifetime of the vehicle. The typical car on the road in the United States is 11.5 years old. The number of vehicles 16 to 24 years old is 44 million. The number of vehicles on the road at least 25 years old is about 14 million.

57.    A reasonable consumer is damaged by the substantial cost in time and money of attempting to diagnose and fix the Power Steering Assist defect.

58.    Many purchasers and lessees of Class Vehicles have spent hundreds of dollars or more on defect-related repairs and related expenses.

59.    The mileage and durational limitations in GM's Limited Warranty, as applied to Plaintiffs and Class Members, are unconscionable. GM knew about the inherent defect in the electronic power steering torque assist sensor at various points, including: (1) when it designed and manufactured the electronic power steering torque assist sensor and performed pre-sale testing and validation, (2) when individuals began to lodge complaints with NHTSA, and (3) before Plaintiffs and the Class purchased their GM vehicles and/or paid for repairs that were not covered under warranty.  Still, GM opted not to warn, disclose, or otherwise inform the

potential or eventual purchasers about the defect. GM continues to refuse disclosure of this known defect to this date on newly sold Class Vehicles.

60.    GM has never disclosed the defect to drivers or potential purchasers or lessees of Class Vehicles, and GM has inadequately instructed its dealerships to disclose the defect to drivers or potential purchasers or lessees of Class Vehicles.

61.    The defect was not known to or reasonably discoverable by the Plaintiffs and proposed Class Members before purchase or lease, or without experiencing the defect first-hand and exposing themselves to an unreasonable safety risk.

62.    GM has inadequately responded even as it has and learned of at least hundreds of complaints about Class Vehicles directly from its customers, through its dealers, and from NHTSA.

63.    Because of GM's inadequate action and silence, many consumers are unaware that they purchased, and continue to drive, unsafe and unreliable vehicles. As GM knows, a reasonable person would consider the defect important and would either not purchase or lease a vehicle with the defect were the defect disclosed in advance or would pay substantially less for the vehicle.

64.    Plaintiffs and the putative class members neither knew, nor could have known, about the defective nature of the electronic power steering torque assist sensor at the time they purchased their Class Vehicles.   GM knowingly

manufactured vehicles that contained an inherent defect but did not inform Plaintiffs of the problem when Plaintiffs agreed to purchase the Class Vehicle or any time thereafter. GM has vigorously refused to acknowledge that the electronic power steering torque assist sensor are the source of the defect to avoid having to pay for a replacement with a non-defective electronic power steering torque assist sensor under its Limited Powertrain Warranty. GM intentionally limited the company's liability for the known defect, and Plaintiffs and putative class members never could bargain for a warranty that would have covered the defect because they did not know of its existence. GM's material omission concerning the defect rendered the warranty unconscionable as applied to Plaintiffs and class members.

## PLAINTIFFS' EXPERIENCES

### *Robert Ambrose*

65. On or about March 17, 2016, Plaintiff Ambrose purchased a new 2016 Chevy Colorado from Bridgewater Chevrolet at 1548 US-22, Bridgewater Township, NJ 08807.

66. Plaintiff Ambrose was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. He was influenced by GM's marketing of its vehicles as reliable and reflective of superior American-made quality, which pushed him away from considering Volkswagen products. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff

Ambrose greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

67.     Plaintiff Ambrose estimates that he experienced the signature symptoms of the defect between fifty and seventy times. One such instance is representative of his general experience with the defect. One night around July 2020, Plaintiff Ambrose was driving on the highway at about 55 MPH when he felt the steering wheel become heavy. Plaintiff likens the experience of trying to move the wheel to that of moving a cinderblock. While the vehicle was in motion, Plaintiff shifted the vehicle into Neutral and turned the ignition key off. Luckily for Plaintiff, there was little traffic around him. Upon turning the ignition key again, the defect was no longer present, at which point Plaintiff pulled off of the highway and into the parking lot. A Google search turned up multiple complaints detailing what he had himself experienced.

68.     On September 18, 2020, Plaintiff Ambrose contacted the dealership and took his vehicle in. He brought with him the recall notice and service bulletin related to the defect. The dealership did not acknowledge the defect, nor diagnose the problem but informed Plaintiff the cost to repair would be about $1,600. Plaintiff Ambrose has not taken the vehicle in since because he expects he will be made to pay the repair cost. As a temporary remedy, Plaintiff continues turning the car off

and on when he feels the power steering go out. The frequency of the defect has put Plaintiff in several close calls but he has so far managed to avoid an accident.

69.     Had Plaintiff Ambrose known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Scott Barnes*

70.     In August 2015, Plaintiff Barnes took delivery of his new 2016 Chevy Colorado at Maher Chevrolet in St. Petersburg, Florida after custom ordering it from General Motors' website for about $38,000.

71.     Plaintiff Barnes was in the market for a mid-range truck with towing power and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its durability and safety. Plaintiff Barnes was choosing between the Chevy Colorado and the Toyota Tacoma. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Barnes greatly values vehicle safety, and often drives the vehicle with his wife as a passenger. Disclosure of the defect would have affected his purchasing decision.

72.     Plaintiff Barnes began experiencing the signature symptoms of the defect around late spring or early summer of 2018 when the vehicle had about 40,000 miles on it. When driving, he would suddenly lose power steering and see a flashing

light that there was no stabilitrak. For example, in the summer of 2018, Plaintiff Barnes was driving in the roundabout at the Tampa International Airport when he suddenly lost power steering, which made it difficult to maneuver in traffic, especially with other vehicles traveling at varying speeds and stopping to pick up passengers. Another time in the summer of 2018, his wife was driving in to the parking lot of a Publix grocery store in Saint Petersburg when the vehicle abruptly lost power steering. His wife struggled to turn the wheel and refused to drive the vehicle after this incident.

73.    Plaintiff Barnes experienced the defect many additional times. After researching the matter, Plaintiff Barnes discovered that there was a recall but that it only pertained to certain model year 2015 vehicles. He also knew that his mileage at the time was beyond the limits of the warranty and that, based on his research, any appeal to GM or his local dealership would be futile.

74.    As a result, in 2019, Plaintiff Barnes decided to just order the necessary parts and replace the power steering himself. He ordered a power steering rack and pinion from Rock Auto for about $800 and spent approximately three hours replacing the parts.

75.    Had Plaintiff Barnes known of the defect at the time of sale, he would not have purchased the vehicle, or would have paid less for it to fully account for the cost of the defect.

*Richard Chapman*

76.     In April 2015, Plaintiff Chapman leased a new 2015 GMC Canyon with an option for purchase from Seaview Buick GMC at 17909 Hwy 99, Lynnwood, Washington 98037. In June 2018, before he experienced loss of power steering, Plaintiff Chapman exercised the purchase option, paying cash to buy the vehicle at the residual price.

77.     Plaintiff Chapman was in the market for a mid-sized truck. In selecting his Class Vehicle, he relied on GM's representations about the functionality and features of the "premium" vehicle, including regarding its durability and safety. In making representations about the Class Vehicle prior to lease, GM never disclosed the defect. GM also never disclosed the defect prior to Plaintiff Chapman exercising his option to purchase the vehicle in June 2018. Plaintiff Chapman greatly values vehicle safety, and often drives the vehicle with his wife as a passenger. Disclosure of the defect would have affected his leasing and purchasing decision.

78.     Plaintiff Chapman began experiencing the signature symptoms of the defect in September or October of 2019. At the time, Plaintiff Chapman's vehicle had about 20,000 miles on it. The first incident happened while he was traveling about 55 mph on State Highway 307, near Poulsbo, Washington. As he suddenly lost power steering, he heard a chime, and then saw two alternating dashboard warnings flashing notifications that his power steering and stabilitrack needed

31

servicing. Plaintiff Chapman thankfully managed to navigate the vehicle to safety by exerting significant torque on the steering wheel to change lanes on the highway and take the exit. Once stopped at a safe location, Plaintiff Chapman turned the engine off, waited a few minutes, and then restarted the engine, which appeared to remedy the issue.

79.    After the first incident, Plaintiff Chapman experienced the defect about two additional times and then took the vehicle in to the Seaview Buick GMC dealership. The representatives at the dealership acted as if they had neither seen nor heard of Class Vehicles having the defect. They charged Plaintiff Chapman $400 to diagnose the problem and install a new battery, which the dealership suggested to be the cause.

80.    To Plaintiff Chapman's dismay, the defect persisted, endangering him, his family, and others on the road. Following the first visit to the dealership to fix the defect, Plaintiff Chapman lost power steering an additional three times. His wife no longer would drive the vehicle out of fear that it would suddenly lose power steering and she would be unable to safely pull it over.

81.    In February of 2020, Plaintiff Chapman and his wife planned a vacation to Oregon, where they would visit their granddaughter in Portland and also wine country. They took the GMC Canyon and, again, experienced the defect. When heading north on I-5 coming out of southern Oregon, winding through mountains,

Plaintiff Chapman's vehicle again suddenly lost power steering. Given the terrain and the need to potentially swerve in a hurry when the vehicle would lose power steering, the Chapmans decided it was safer to just cut their vacation three days short and head home.

82.    Once home, on February 20, 2020, Plaintiff Chapman again contacted the Seaview dealership to have them fix the defect. This time the dealership quoted a price of about $1,700 but was able to have GM make a "goodwill" payment for half of the cost. Plaintiff Chapman felt that he had no choice but to pay the remaining $850 to try and fix the defect. So he did, and brought the vehicle in to the dealership for repair.

83.    In addition to the cost to diagnose the defect, pay for an unneeded battery, and to fix the defect, Plaintiff Chapman also lost about $150 in gas mileage and ferry fees. Plaintiff Chapman also lost significant time since he made two trips to the dealership and each trip, one way, takes about an hour and a half to two hours.

84.    Had Plaintiff Chapman known of the defect at the time of lease or purchase, he would not have leased or purchased the vehicle, or would have paid less for it to fully account for the cost of the defect.

*Ryan Cirignano*

85.    In August 2016, Plaintiff Cirignano purchased a new 2016 Chevy Colorado from Myrtle Beach Chevrolet Cadillac at 1785 US-501, Myrtle Beach, South Carolina 29577.

86.    Plaintiff Cirignano was in the market for a mid-size truck and, in purchasing his Class vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. He was influenced by GM's marketing of its vehicles as reliable and reflective of superior American-made quality. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Cirignano greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

87.    Plaintiff Cirignano experienced the signature symptoms of the defect multiple times. At the time of the first incident, Plaintiff Cirignano's vehicle had about 35,000 miles on it. On one such instance in 2019, Plaintiff Cirignano was driving on the highway at about 45-50 MPH when he felt the steering wheel become heavy and difficult to steer. While the vehicle was in motion, Plaintiff Cirignano stopped the vehicle in a middle turn lane on the road, at which point Plaintiff Cirignano turned the Class Vehicle off and back on. After Plaintiff Cirignano started the Class Vehicle again, the defect was no longer present and Plaintiff Cirignano was able to continue driving.

88.     Plaintiff Cirignano contacted the dealership and took his vehicle in for inspection. The dealership gave no indication that this was a common defect known to GM or the dealership, did not diagnose the problem and did not provide a repair estimate. Plaintiff Cirignano has not taken the vehicle in for repair because the problem has not been diagnosed, and because he expects he will be made to pay any repair cost. As a temporary remedy, Plaintiff has continued turning the car off and on when he feels the power steering go out.

89.     Had Plaintiff Cirignano known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Chris Faussett*

90.     On or about September 2, 2016, Plaintiff Faussett purchased a new 2016 Chevy Colorado from Rydell Chevrolet at 18600 Devonshire St., Northridge, California 91324.

91.     Plaintiff Faussett was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Faussett greatly values vehicle safety, particularly because he drives the vehicle with his fiancé as a passenger. Disclosure of the defect would have affected his purchasing decision.

35

92.     Plaintiff Faussett began experiencing the signature symptoms of the defect in late fall 2019. The vehicle would abruptly and inexplicably lose power steering while driven, sometimes at high speeds. Initially, the loss of power steering was sporadic but over time became more frequent to the point that it would happen a few times a week. When the loss of power steering would occur, Plaintiff would do his best to pull over to a safer location, turn off the vehicle, wait a minute or two, and then turn it back on. This would often remedy the problem until the next time he lost power steering.

93.     Around late January or early February 2020, the defect was manifesting frequently and clearly posing serious risks to Plaintiff Faussett's safety. On one occasion in that time period, Plaintiff Faussett was driving the vehicle north on Foothill Boulevard in Los Angeles at about 25 to 30 miles per hour, and preparing to take the gradual right curve to merge onto Sierra Highway. About halfway through the curve, the power steering suddenly went out without warning. As a result, the vehicle went into the lane to the left of him, which had vehicles moving in the same direction. Thankfully, there was not another vehicle where he moved into the lane. If there had been, he would have collided with it, and one or both vehicles could have ended up in oncoming traffic, where vehicles are coming at 55 miles per hour. The experience understandably left Plaintff Faussett shaken.

94.     Shortly after, Plaintiff Faussett scheduled an appointment to take his Class Vehicle in to Rydell Chevrolet to, among other things, diagnose and fix the defect.

95.     Plaintiff Faussett took the vehicle in to Rydell Chevrolet on or around March 3, 2020. At the time the vehicle had approximately 55,000 miles on it. The GM dealership quoted him a price of $250 for the diagnostic and then $1700 to fix the defect. Plaintiff Faussett asked if GM or the dealership would cover any of the amount, including under warranty, and the GM dealership said they would not. They also gave no indication that this was a common defect known to GM or the dealership. Plaintiff Faussett felt that he had no choice but to pay out of pocket to fix the defect. So he did. The total cost was $1,987.03.

96.     In addition to the cost to diagnose and fix the defect, Plaintiff also lost gas mileage driving to and from Rydell Chevrolet, which is about 25 miles from his home.  He also lost time since this trip takes about an hour.

97.     Had Plaintiff Faussett known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Milan Grujic*

98.     Plaintiff Grujic purchased a new 2015 Chevy Colorado or around December 5, 2014 from Advantage Chevrolet, at 9510 Joliet Road, Hodgkins, Illinois 60525.

99.     Plaintiff Grujic was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Grujic greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

100.   Plaintiff Grujic estimates that he experienced the signature symptoms of the defect scores of times, beginning in March 2020. Plaintiff Grujic first relied on stop-gap solution of turning his car on and off which would temporarily restore his power steering. Ultimately, the defect became virtually a daily occurrence, significantly hampering his driving of the vehicle, including making turns at intersection where Plaintiff Grujic narrowly escaped accidents. For example, when his power steering failed while he was making right turns, he would find himself going wide into oncoming traffic. Because of the defect, Plaintiff limited the manner in which he used his vehicle.

101.   By mid-September 2020, the defect started to manifest daily, and Plaintiff Grujic paid approximately $1,900 to his Chevy dealer to fix the problem.

Plaintiff Grujic researched the defect and learned of the recall of other model year 2015 Chevy Colorado vehicles. When he inquired at the dealership regarding whether GM would cover the repair costs, he was told that his vehicle did not fall into the category of vehicles covered by the recall for the defect, and that GM would not cover his repair costs.

102.   Had Plaintiff Grujic known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*David Keller*

103.   On or about September 28, 2016, Plaintiff Keller purchased a new 2015 GMC Canyon from Vestal Buick GMC at 900 NC-66, Kernersville, North Carolina 27284.

104.   Plaintiff Keller was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. He was influenced by GM's marketing of its vehicles as reliable and reflective of professional American-made quality, which pushed him away from considering Toyota products. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Keller greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

39

105.   Plaintiff Keller estimates that he has experienced the signature symptoms of the defect between 20 and 25 times. At the time of the first incident, Plaintiff Keller's vehicle had about 65,000 miles on it. On one such instance around October 2020, which is representative of his general experience with the defect, Plaintiff Keller was driving on a winding two-lane road at about 45 MPH when he felt the steering wheel stiffen and become heavy. When the defect occurred, Plaintiff Keller saw traffic in front of and behind his vehicle. Plaintiff Keller was able to steer the vehicle into a nearby gas station and park. Plaintiff Keller turned the vehicle off and back on four or five times before the defect was no longer present, at which time Plaintiff Keller was able to drive again.

106.   Plaintiff Keller contacted GM about the defect on or around April 27, 2020. Plaintiff Keller contacted a local dealership, Love Buick GMC in Columbia, South Carolina, about the defect on or around April 29, 2020. Love Buick GMC diagnosed the problem as the electrical rack and pinion needing replacement, and informed Plaintiff Keller the cost to repair would be about $2,330. GM offered to cover $350 of that $2,330 repair cost but gave no indication that this was a common defect known to GM or the dealership. Plaintiff Keller has not had the vehicle repaired because he expects he will be made to pay at least $1,980 of the $2,330 repair cost. As a temporary remedy, Plaintiff continues turning the car off and on when he feels the power steering go out.

40

107.   Had Plaintiff Keller known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*John Kobel*

108.   On April 16, 2015, Plaintiff Kobel took delivery of his new 2015 Chevy Colorado from Robert Chevrolet in Hicksville, NY, which he had purchased new from GM on February 12, 2015.

109.   Plaintiff Kobel was in the market for a mid-sized truck. In purchasing his Class Vehicle, he relied on GM's representations about the functionality and features of the "premium" vehicle, including regarding its durability and safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Kobel greatly values vehicle safety, and often drives the vehicle with his family including his daughter. Disclosure of the defect would have affected his purchasing decision.

110.   Plaintiff Kobel began experiencing the signature symptoms of the defect on or around August 8, 2020. At the time of the first incident, Plaintiff Kobel's vehicle had approximately 91,150 miles on it. The first incident happened while he was traveling at highway speeds, getting onto the Southern State Parkway from the Watangh Parkway. As he was coming around the curve, he suddenly lost power steering in his Colorado. He was thankfully able to navigate off the Southern State

Parkway and to his home, a few blocks away. After stopping and then starting the vehicle up again, the power steering appeared to be restored.

111.   Just two days later, however, Plaintiff Kobel lost power steering again as he pulled into his driveway.

112.   Plaintiff Kobel did research on the defect and discovered that there was a recall that appeared to apply to his vehicle since it described the same loss of power steering that he suffered. With this information, he went back to Robert Chevrolet to receive the fix he believed he was entitled to under the recall. The dealership, however, looked up his vin number and told Plaintiff Kobel that his vehicle was not subject to the recall for the defect and that he would need to pay approximately $1,800 out of pocket to have it fixed.

113.   Plaintiff Kobel then took his Colorado to his mechanic, Joseph Service Center in Seaford, NY, on August 20, 2020, and was initially quoted a price of $1,300. Seeing no other option than to have the work completed, Plaintiff Kobel opted for Joseph Service Center to do so. After it was done, however, an error code appeared, and on further investigation, Joseph Service Center determined that it would have to pay General Motors for code to make the error go away. Joseph Service Center passed on an additional charge of $225 to Plaintiff Kobel to remove the error code.

114.   In addition to the cost to fix the defect, Plaintiff Kobel also lost money in gas mileage since the dealership is about a 10 mile drive from his home, one way. Plaintiff Kobel also lost meaningful time since each trip, one way, takes about 15 minutes.

*Daniel Lawson*

115.   On or about September 22, 2015, Plaintiff Lawson purchased a 2016 GMC Canyon from Bob Luegers Motors at 1050 Wernsing Rd, Jasper, IN 47546.

116.   Plaintiff Lawson was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Lawson greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

117.   Plaintiff Lawson began experiencing the signature symptoms of the defect in the Summer of 2019. At the time of the first incident, Plaintiff Lawson's vehicle had approximately 69,000 miles on it. Following a trip to his local auto parts store, Plaintiff Lawson lost power steering in the parking lot as he shifted the vehicle into drive. Finding nothing wrong under the hood, he turned the vehicle off and on, which appeared to rectify the issue. Plaintiff drove his vehicle to the dealership to inform them of the issue and was told they had no knowledge of this problem.

Around six months later, Plaintiff's lost power steering again while on the road. Luckily, there was no traffic around, allowing him to safely pull over and perform the same remedy as before: turning the vehicle off and on.

118.    Around late March 2020 Plaintiff Lawson experienced the defect two more times, clearly posing serious risks to his safety. Plaintiff made an appointment with the dealership so that they may diagnose the problem and took his vehicle in on April 3, 2020. At that time, the vehicle's odometer read 73,414 miles. He was told the cause of the defect was due to low voltage in the battery. The dealership recommended a battery replacement to resolve the issue, for which Plaintiff Lawson paid $322.07. The

119.    A mere one and a half miles later, Plaintiff Lawson's power steering went out again. Clearly frustrated, Plaintiff demanded that the dealership repair the defect. The dealership still gave no indication that this was a common defect known to GM. Nevertheless, on April 8, 2020, Plaintiff received his vehicle, which had its steering gear replaced. GM covered $608.98 of the repair cost, leaving Plaintiff Lawson to shoulder the remaining $744.31.

120.    Had Plaintiff Lawson known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Lori Magallanes*

44

121.   On or about August 2016, Plaintiff Magallanes and her husband purchased a 2016 Chevy Colorado from Penske Chevrolet of Cerritos at 18605 Studebaker Rd, Cerritos, CA 90703.

122.   Plaintiff Magallanes was in the market for a mid-sized truck and, in purchasing her Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Magallanes greatly values vehicle safety. Disclosure of the defect would have affected her purchasing decision.

123.   Plaintiff Magallanes experienced the signature symptoms of the defect on or about September 12, 2019. At the time the defect manifested, Plaintiff Magallenes' vehicle had 53,779 miles recorded. While on her way to visit her husband at the hospital, Plaintiff Magallanes' power steering went out as she prepared to exit the freeway. The steering column locked up and Plaintiff had difficulty turning the wheel. She turned off the freeway as quickly as she could and exited the vehicle upon finding a safe place to park. She did not want to drive the vehicle any further.

124.   Plaintiff Magallanes called AAA and was told that she would need to have the vehicle towed. If the defect manifested again, AAA warned, Plaintiff might lose control of the vehicle. Plaintiff Magallanes towed the vehicle to Chevrolet of

Montebello, which diagnosed the problem and informed Plaintiff she had a faulty torque sensor that needed replacement. Plaintiff asked the dealership whether the part was under recall, to which they replied that it was not. Plaintiff asked the dealership whether any of the work would be covered by her warranty, to which they said nothing was covered. The dealership also gave no indication that this was a common defect known to GM or the dealership. The cost of the repair totaled $2,700.86, which she paid.

125. Had Plaintiff Magallanes known of the defect at the time of the sale, she would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Noam Meir*

126. On or around January 2015, Plaintiff Meir purchased a 2015 Chevrolet Colorado from Maritime Chevrolet, 985 Post Rd., Fairfield, CT 06824.

127. Plaintiff Meir was in the market for a mid-size truck and, in purchasing his Class vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. He was influenced by GM's marketing of its vehicles as reliable and reflective of superior American-made quality. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Meir greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

128.   Plaintiff Meir estimates that he experienced the signature symptoms of the defect at least thirty times. At the time of the first incident, Plaintiff Meir's vehicle had approximately 80,000 miles on it. When the defect manifested, the vehicle's dashboard lights would suddenly light up and the vehicle would abruptly lose power steering. When the loss of power steering would occur, Plaintiff Meir would pull over, turn the vehicle off and then back on. This would typically remedy the problem until the next time he lost power steering.

129.   Plaintiff Meir contacted both GM and the dealership to inquire about repairs, and was told that any repair would not be covered under warranty. The dealership gave no indication that this was a common defect known to GM. Plaintiff Meir felt that he had no choice but to pay out of pocket to fix the defect, and ultimately paid approximately $1400 for the power steering rack to be replaced.

130.   Had Plaintiff Meir known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Eric Ostrander*

131.   On or about February 2016, Plaintiff Ostrander purchased a 2016 GMC Canyon from Cardinale GMC at 2 Heitzinger Plaza, Seaside, CA 93955.

132.   Plaintiff Ostrander was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality

and features of the vehicle, including regarding its safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Ostrander greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

133.   Plaintiff Ostrander estimates that he experienced the signature symptoms of the defect hundreds of times, beginning in January 2017. At the time of the first incident, Plaintiff Ostrander's vehicle had approximately 35,000 miles on it. Because of the frequency and unpredictability of the defect, Plaintiff Ostrander has had to maintain a strong grip on the vehicle. When approaching curves, Plaintiff grips the steering wheel with both hands in the event the defect will occur, as has happened in the past. The defect's occurrence, first happening about every six months from its onset, is now a daily event and Plaintiff can almost estimate when the defect is more likely to manifest—usually within ten miles of his twenty-two-mile commute to work. Plaintiff's recreational time is also hampered by the defect as he frequently hikes and finds himself on curvy roads that are made more dangerous when he loses power steering.

134.   Plaintiff Ostrander has taken the vehicle to the dealership on three occasions. The first time, around June 2017, Plaintiff took the vehicle to McKenny Chevrolet in Gastonia, North Carolina where he was told by the technicians the problem was either a programming or electrical error with the vehicle's computer.

At that time, Plaintiff Ostrander's vehicle had around 22,000 miles on it. In Plaintiff's second visit on or around December 2017, he was told by the technicians that they had rebooted the vehicle's computer in order to fix it.  Plaintiff Ostrander has not been back to the dealership since around April or May 2020 because he was told the power steering unit needs replacement, which will cost him $2200 to fix. Plaintiff can complete the work himself and believes GM should compensate him for the parts.

135.   When Plaintiff has asked for his service records, he was told there were no records kept of his visit to the dealership. He has, however, been made to pay the $225 diagnostic fee all three times he took the vehicle in. The dealership has never given any indication that this was a common defect known to GM or the dealership. The vehicle currently has around 45,700 miles.

136.   Plaintiff Ostrander has made due by recycling the ignition. Sometimes while driving, Plaintiff will shift the car into Neutral, turn the ignition key off, and then then turn it back on again. The defect temporarily ceases until it inevitably reappears.

137.   Had Plaintiff Ostrander known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Robert Overturf*

138.   In March 2015, Plaintiff Robert Overturf purchased a new 2015 Chevrolet Colorado from Prostrollo Motor Sales in Huron, South Dakota. Mr. Overturf's Colorado came with a defective electronic power steering torque assist sensor that made it susceptible to the Power Steering Assist defect. GM did not disclose this to Mr. Overturf, who greatly values vehicle safety and who wanted, and paid for, a fully functional vehicle.

139.   From the date of purchase to the present, Plaintiff has serviced his vehicle in a timely and proper manner.

140.   Mr. Overturf has twice experienced the Power Steering Assist defect with the first happening on or about August 6, 2020 when his vehicle had approximately 80,150 miles on it.  In each occurrence Mr. Overturf was driving on a state highway when he lost control of the vehicle and the dashboard light came on. Mr. Overturf turned the car off and on to see if the dashboard message would reset.

141.   After that, Mr. Overturf took his vehicle towed to the Denny Menholt Chevrolet in Rapid City, South Dakota for diagnosis and repair. Among other things, the Menholt dealership found an intermittent short and needed to replace the electric steering gear. The Menholt dealership listed a total charge of $1,752.29 for this diagnosis and repair work, which was not covered by GM's warranty. The dealership also gave no indication that this was a common defect known to GM or the dealership.

142.   General Motors, through its franchised dealership, refused to honor its warranty and instead denied that Mr. Overturf's vehicle Power Steering Assist defect results from a widespread defect long known to GM.

143.   Mr. Overturf has never received a reimbursement for his out of pocket expenses.

*Stephen Lutsk*

144.   On or about November 28, 2014, Plaintiff Lutsk purchased a 2015 Chevy Colorado from Mountain View Chevrolet, 1079 W. Foothill Blvd, Upland, CA 91786.

145.   Plaintiff Lutsk was in the market for a mid-sized truck and, in purchasing his Class Vehicle, relied on GM's representations about the functionality and features of the vehicle, including regarding its safety. In making representations about the Class Vehicle, GM never disclosed the defect. Plaintiff Lutsk greatly values vehicle safety. Disclosure of the defect would have affected his purchasing decision.

146.   Plaintiff Lutsk estimates that he first experienced the signature symptoms of the defect in 2019 when his vehicle had approximately 40,000 miles. When he restarted his vehicle the power steering came back. Over the next several months, the defect manifested intermittently, and he was able to turn off and restart his vehicle to temporarily bring back the power steering.

147.   Ultimately, the defect started to happen every day, and Plaintiff Lutsk nearly got into multiple accidents, including in parking lots and on while driving between 30 – 40 mph on surface roads. Plaintiff Lutsk specifically recalls nearly getting into an accident when trying to pull into a spot in a parking lot a low speed, when the power steering is most necessary. The defect was worse when he was traveling at lower speeds and needed the power assist to control his vehicle.

148.   Unable to continue driving his vehicle with the defect, Plaintiff Lutsk finally took his vehicle to Nissani Brothers Chevrolet in Culver City, CA, to have it repaired in January 2020 when it had 47,000 miles. Plaintiff explained to the dealership that this was a known defect with 2015 MY Chevy Colorado vehicles, but the dealer refused to cover his repair costs, charging him $2,365.03 to repair it.

149.   Plaintiff Lutsk afterward reached out to GM corporate customer service to recover the repair expenses. He was told he was not eligible for reimbursement because his vehicle did not fit within a specific VIN range for the recall for the defect.

150.   In or around March 2020, Plaintiff Lutsk received another call from GM corporate customer service with an offer to make a partial good will refund of the repair costs. GM corporate later decided against making a partial good will refund of the repair costs on the ostensible basis of preexisting cosmetic damage to

Plaintiff's vehicle. Plaintiff Lutsk has therefore not recovered any portion of his repair costs from GM.

151.   Had Plaintiff Lutsk known of the defect at the time of the sale, he would not have purchased the vehicle or would have paid less for it to fully account for the cost of the defect.

*Michael Woronko*

152.   On or about June 9, 2016, Plaintiff Michael Woronko purchased a new 2016 Chevrolet Colorado from Bill Crispin Chevrolet in Saline, Michigan. Mr. Woronko's Colorado came with a defective electronic power steering torque assist sensor that made it susceptible to the Power Steering Assist defect.  GM did not disclose this to Mr. Woronko, who greatly values vehicle safety and who wanted, and paid for, a fully functional vehicle.

153.   From the date of purchase to the present, Plaintiff has serviced his vehicle in a timely and proper manner.

154.   Mr. Woronko experienced the Power Steering Assist defect in or around July 2019 when his vehicle had approximately 56,000 miles on it. Mr. Woronko attempted to back his vehicle out of his driveway when the steering failed to work and the dashboard light came on. Mr. Woronko turned the car off and on to see if the dashboard message would reset.

155.   After that, Mr. Woronko had his vehicle towed to the Kool Chevrolet,

Inc. dealership for diagnosis and repair. Among other things, the Waldorf dealership found that the vehicle displayed the power steering message and needed a new steering rack assembly. The Grand Rapids dealership listed a total charge of $1,874.99 for this diagnosis and repair work, which was not covered by GM's warranty.

156.   General Motors, through its franchised dealership, refused to honor its warranty and instead denied that Mr. Woronko's vehicle Power Steering Assist defect results from a widespread defect long known to GM.

157.   Mr. Woronko has never received a reimbursement for his out of pocket expenses.

## CLASS ACTION ALLEGATIONS

158.   Under Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs seek certification of the following classes:

### Nationwide Class:

All natural persons who purchased or leased a Class Vehicle in the United States.

### California Subclass:

All natural persons who purchased or leased in California a Class Vehicle.

### Connecticut Subclass:

All natural persons who purchased or leased in Connecticut a Class Vehicle.

### Florida Subclass:

All natural persons who purchased or leased in Florida a Class Vehicle.

### Illinois Subclass:

All natural persons who purchased or leased in Illinois a Class Vehicle.

### Indiana Subclass:

All natural persons who purchased or leased in Indiana a Class Vehicle.

### Michigan Subclass:

All natural persons who purchased or leased in Michigan a Class Vehicle.

### New Jersey Subclass:

All natural persons who purchased or leased in New Jersey a Class Vehicle.

### New York Subclass:

All natural persons who purchased or leased in New York a Class Vehicle.

### North Carolina Subclass:

All natural persons who purchased or leased in New York a Class Vehicle.

### South Carolina Subclass:

All natural persons who purchased or leased in South Carolina a Class Vehicle.

### South Dakota Subclass:

All natural persons who purchased or leased in South Dakota a Class Vehicle.

### Washington Subclass:

All natural persons who purchased or leased in Washington a Class Vehicle.

159.  Excluded from the proposed Nationwide Class and each proposed Subclass are: General Motors, any affiliate, parent, or subsidiary of GM; any entity in which GM has a controlling interest; any officer, director, or employee of GM; any successor or assign of GM; anyone employed by counsel for Plaintiffs in this action; any judge to whom this case is assigned, her or her spouse, and all persons within the third degree of relationship to either of them, and the spouses of such persons; and anyone who purchased a Class Vehicle for resale.

## NUMEROSITY

160.   The members of the classes are so numerous that joinder of all members is impracticable.  While the precise number of Class Members can only be confirmed through discovery, it is estimated that at least hundreds of thousands of persons purchased or leased Class Vehicles.

## COMMON QUESTIONS OF LAW AND FACT PREDOMINATE

161.   There is a well-defined community of interest in the questions of law and fact affecting the Class Members.

162.   There are questions of law and fact common to all members of each

Class: specifically, Plaintiff's claims arise from the same event or practice or course of conduct by the Defendant that gives rise to those claims of the putative classes, and Plaintiff's claims are based upon the same legal theories as those of the putative classes. The Defendant has engaged in a pattern and practice, in violation of the law, of not informing all purchasers or potential purchasers of the known defect in the Class Vehicles. The resolution of this issue—to wit, whether Defendant knew about the defect and did not inform Plaintiffs and class members—is a common question of fact and law that will affect all members of the class in the same manner.

163.   The questions of law and fact common to the Class predominate over questions that may affect individual members, and include:

a.    Whether General Motors disclosed the known Class defect to Class Members prior to their purchase;

b.    Whether General Motors violated state consumer protection laws by concealing the known Class defect;

c.    Whether Class Members are entitled to actual damages and, if so, the appropriate amount;

d.    Whether members of the classes may be notified and warned about the defect and may have the entry of final and injunctive relief compelling General Motors to issue a notification and warning to all Class Members about such a defect;

e.      Whether General Motors deliberately failed to disclose material facts to Plaintiffs and the class members; and

f.      Whether Defendant manufactured defective electronic power steering torque assist sensors and should replace them at no cost to Plaintiffs and the class members.

## TYPICALITY

164.   The claims and defenses of the Named Plaintiffs are representative of the Class Members he seeks to represent and typical of the claims and defenses of the class because the Plaintiffs and the class members all owned Class Vehicles with defective electronic power steering torque assist sensors that were manufactured and sold by Defendant. Plaintiffs, like all class members, purchased a Class Vehicle without having received any warning or notification from Defendant of the defect.

## ADEQUACY OF REPRESENTATION

165.   The Named Plaintiffs will fairly and adequately assert and protect the interests of the proposed class because:

a.      Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the classes;

b.      Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action; and

c.    Plaintiffs have suffered consumer-related injuries and damages.

## SUPERIORITY

166.   A class action provides a fair and efficient method for the adjudication of the instant controversy for the following reasons:

a.    The common questions of law and fact set forth above predominate over questions affecting only individual Class Members;

b.    The proposed classes are each so numerous that joinder would prove impracticable. The proposed classes, however, are not so numerous as to create manageability problems; moreover, no unusual legal or factual issues render the class unmanageable.

c.    Prosecution of separate actions by individual members of the class would risk inconsistent and varying adjudications against Defendant;

d.    The claims of the individual Class Members are small in relation to the expenses of litigation, making a class action the only procedure in which Class Members can, as a practical matter, recover for the damages done to them by GM.

e.    A class action would be superior to, and more efficient than, adjudicating thousands of individual lawsuits.

167.   In the alternative, the proposed classes may be certified because:

a. The prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent or varying adjudication regarding individual Class Members, which would establish incompatible standards of conduct for GM;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications dispositive of the interests of other Class Members not parties to the adjudications and substantially impair or impede their ability to protect their interests; and

c. GM has acted or refused to act on grounds generally applicable to the proposed class, which justifies final and injunctive relief for the members of the proposed class as a whole.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

168. Defendant General Motors LLC has possessed exclusive knowledge about the Class defect, including from its customer complaint and warranty records, internal emails, reports, analyses, and assessment of engineers, that is unavailable to Plaintiffs and the proposed class members.

169. GM is estopped from relying on any statutes of limitation or repose due to its acts of concealment. Defendant knew about the defect in the Class Vehicles for years but concealed it and/or failed to alert purchasers or potential purchasers. Defendant maintained exclusive control over information concerning the known, but

non-public, defect and the number of Class Vehicles at issue; Plaintiffs and class members, therefore, could not reasonably have known about the defect or the number of Class Vehicles affected.  Defendant is estopped from relying on any statutes of limitations or repose that might otherwise apply to the claims asserted herein.

## EXPRESS AND IMPLIED WARRANTIES

170.   For each Class Vehicle sold by GM, an express written warranty was issued which covered the vehicle, including but not limited to, the powertrain and electronic power steering torque assist sensor, and GM warranted the vehicle to be free of defects in materials and workmanship at the time of purchase or lease.

171.   Pursuant to its express and written warranties, GM warranted the Class Vehicles' powertrain, including the powertrain and electronic power steering torque assist sensor, to be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship which occurred during the first 3 years or 36,000 miles, whichever came first, and 5 years or 60,000 miles for the powertrain, whichever came first.

172.   GM also sold or leased the Class Vehicles to Class Members under implied warranties of merchantability and fitness for a particular purpose. GM impliedly warranted the Class Vehicles to be merchantable, fit for the ordinary

purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by their owners or lessees for the ordinary purpose for which they were intended and were not otherwise injurious. GM is under a duty to design, construct, manufacture, inspect, and test the Class Vehicles so as to make them suitable for the ordinary purposes of their use—transportation at interstate speeds.

173.   GM breached its warranties for the Class Vehicles as a result of the latent defects in the powertrain; denying the defect in the powertrain when confronted with complaints of loss of power steering; failing to repair the vehicles as warranted; and otherwise inadequately repairing the defect through ineffective repairs or replacement of the defective electronic power steering torque assist sensor with an equally defective electronic power steering torque assist sensor.

174.   In breach of GM's warranties, the Class Vehicles are defective, unsafe, unfit for the ordinary purposes for which they are intended to be used, and not merchantable.

## FIRST CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act
### 15 U.S.C. §§ 2301, *et seq*.
### (Nationwide Class)

175.   Plaintiff, individually and for the Nationwide Class, hereby incorporates each and every allegation as though fully set forth herein.

176.   For each Class Vehicle, GM issued an express written warranty that

covered the vehicle, including but not limited to the drivetrain and powertrain, and which warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

177.   GM breached its express warranties by offering for sale and selling defective vehicles that were by design and construction defective and unsafe, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

178.   Plaintiffs and members of the class are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

179.   Defendant GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

180.   The Class Vehicles at issue are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

181.   Defendant GM's written and implied warranties relate to the future performance of its vehicles because it promised that the powertrain of the Class Vehicles would perform adequately for a specified period of time or mileage, whichever came first.

182.   Defendant GM has breached and continues to breach its written and implied warranties of future performance, thereby damaging Plaintiffs and similarly situated Nationwide Class members, when their Class Vehicles fail to perform as

represented due to an undisclosed powertrain defect.  GM fails to fully cover or pay for necessary inspections, repairs and/or vehicle replacements for Plaintiffs and the Nationwide Class.

183.   Plaintiff, members of Nationwide Class, and the public will suffer irreparable harm if GM is not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Nationwide Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective electronic power steering torque assist sensor, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

184.   GM is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

185.   Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles.

<u>**SECOND CAUSE OF ACTION**</u>
**Breach of Express Warranties**
**(On behalf of the Nationwide Class or, alternatively,**
**on behalf of the State Subclasses)**

186.   Plaintiffs, individually and on behalf of the Nationwide Class or, alternatively, on behalf of their respective state subclasses, hereby incorporate each and every allegation as though fully set forth herein.

187.   Plaintiffs bring this count on behalf of himself and the Nationwide

Class or, alternatively on behalf of the State Subclasses.[1]

188.   For each Class Vehicle sold by GM, an express written warranty was issued that covered the vehicle, including but not limited to the powertrain, and which warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

189.   GM breached its warranties by offering for sale and selling defective vehicles that were by design and construction defective and unsafe, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

190.   GM's breach of its express warranties proximately caused the Plaintiffs and members of the Nationwide Class or, alternatively, Plaintiffs and members of the respective state subclasses to suffer damages in excess of $5,000,000.00.

**THIRD CAUSE OF ACTION**
**Breach of Implied Warranties**
**(On behalf of the Nationwide Class or, alternatively,**
**on behalf of the State Subclasses)**

191.   Plaintiffs, individually and on behalf of the Nationwide Class or, alternatively, on behalf of their respective state subclasses, hereby incorporates each

---

[1] The specific state statutes under which the Plaintiffs proceed on behalf of their respective state subclasses are set forth in a state warranty statute compendium, attached hereto as Exhibit 21.

and every allegation as though fully set forth herein.

192.   Plaintiffs bring this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of the state subclasses.[2]

193.   GM impliedly warranted that the Class Vehicles, which it designed, manufactured, sold, or leased to Plaintiffs and members of the Nationwide Class and their respective state subclasses, were merchantable, fit and safe for their ordinary use, not otherwise injurious to consumers, and would come with adequate safety warnings.

194.   Because the Class Vehicles are equipped with the defective electronic power steering torque assist sensor, the vehicle purchased or leased and used by Plaintiffs, the Nationwide Class, and members of the state subclasses is unsafe, unfit for use when sold, threatens injury to its occupants, and is not merchantable. GM breached the implied warranty of merchantability in the sale or lease of the Class Vehicles to Plaintiffs and members of the state subclasses in that the vehicles were not fit for their ordinary purpose and not merchantable.

195.   Plaintiffs put GM on notice of the breach of implied warranty. For example, Plaintiff Woronko complained to the dealership at the time that his vehicle suffered the defect and when he was charged $1,874.99 in repair costs. Despite

---

[2] The specific state statutes under which the Plaintiffs proceed on behalf of their respective state subclasses are set forth in a state warranty statute compendium. (Exhibit 8).

these complaints, GM did nothing to remedy the defect or to reimburse Mr. Woronko for his repair costs. Plaintiff Woronko also sent a letter to GM on November 12, 2019 but did not receive a response. *See* Exhibit 22.

196.   As a direct and proximate result of GM's breach of the implied warranty of merchantability and fitness for a particular purpose, Plaintiffs and members of the Nationwide Class or, alternatively, Plaintiffs and members of their state subclasses suffered damages in excess of $5,000,000.00.

### FOURTH CAUSE OF ACTION
**Violations of the Song-Beverly Consumer Warranty Act
For Breach of Express Warranty
(Cal. Civ. Code §§ 1790-1795.8)
(By Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander on Behalf of the
California Subclass)**

197.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

198.   Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander bring this claim individually and on behalf of the California Subclass.

199.   Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

200.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code  § 1791(a).

201. GM is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code. § 1791(j).

202. GM made express warranties to Plaintiffs and the California Subclass within the meaning of Cal. Civ. Code. §§ 1791.2 & 1793.2(d).

203. GM breached these express warranties by selling and leasing defective Class Vehicles that required replacement of the power steering assembly within the applicable warranty period. GM refused to pay for replacement of the defective power steering assembly in the Class Vehicles.

204. GM has failed to promptly replace or buy back the Class Vehicles of Plaintiffs and the proposed California Subclass as required under Cal. Civil Code § 1793.2(d)(2).

205. As a direct and proximate result of GM's breach of its express warranties, Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the California Subclass received goods in a condition that substantially impairs their value to Plaintiffs and the other Subclass members. Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander and the Subclass members have been damaged as a result of, among other things, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, actual and potential increased maintenance and repair costs, and actual and potential increased insurance costs.

206.   Pursuant to Cal. Civil Code §§ 1793.2 & 1794, Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the California Subclass are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of the Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the defect.

207.   Pursuant to Cal. Civil Code § 1794(d), (e) Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the California Subclass are entitled to reasonable costs and attorneys' fees.

### FIFTH CAUSE OF ACTION
**Violations of the Song-Beverly Consumer Warranty Act
For Breach of Implied Warranty
(Cal. Civ. Code §§ 1790-1795.8)
(By Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander on Behalf of the
California Subclass)**

208.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

209.   Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander bring this claim individually and on behalf of the California Subclass.

210.   Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

211.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code  § 1791(a).

212.   GM is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code. § 1791(j).

213.   GM impliedly warranted to Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code. §§ 1791.2 & 1792.

214.   Section 1791.1(a) provides that: "Implied warranty merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

(1) Pass without objection in the trade under the contract description;

(2) Are fit for the ordinary purposes for which such goods are used;

(3) Are adequately contained, packaged, and labeled;

(4) Conform to the promises or affirmations of fact made on the container or label.

215.   The defect in the Class Vehicles is present in them when sold and substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the defect causes all or substantially all of the vehicles to experience sudden loss of power steering that impedes safe and reliable driving. The defect thus affects the central functionality of the vehicle and

poses a serious safety risk to driver and passenger safety, leading to hundreds of dollars in repair expenses, out of pocket costs to purchase replacement power steering assemblies and time-consuming and stressful service calls.

216.  Because the defect creates an unreasonable risk to driver and passenger safety, and because the defect impedes safe and reliable driving, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

217.  Class Vehicles are not adequately labeled because the labeling fails to disclose the defect and does not advise the California Subclass of the defect.

218.  Any attempt by GM to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to Sections 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire rise as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code. §1792.4(a). GM's attempted implied warranty disclaimer does not conform to these requirements.

219.   The defect deprived Plaintiffs Faussett, Lutsk, Magallanes, Ostrander, and the California Subclass of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiffs and members of the California Subclass paid.

220.   As a direct and proximate result of GM's breach of its implied warranties, Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the California Subclass received goods in a condition that substantially impairs their value to Plaintiffs and the other Subclass members. Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the Subclass members have been damaged as a result of, among other things, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, actual and potential increased maintenance and repair costs.

221.   Pursuant to Cal. Civil Code §§ 1791.1(d) & 1794, Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the California Subclass are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of the Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the defect.

222.   Pursuant to Cal. Civil Code § 1794(d), (e) Plaintiffs Faussett, Lutsk, Magallanes, and Ostrander, and the California Subclass are entitled to reasonable costs and attorneys' fees.

### SIXTH CAUSE OF ACTION
**Fraudulent Concealment**
**(On behalf of the Nationwide Class or, alternatively,**
**on behalf of the State Subclasses)**

223.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint to the extent not inconsistent with the claims asserted in this Count.

224.   Plaintiffs brings this count on behalf of themselves and the Nationwide Class or, alternatively, on behalf of their respective state subclasses.

225.   GM intentionally and knowingly concealed, suppressed and/or omitted material facts including the presence of the defective electronic power steering torque assist sensor.

226.   GM knew (at the time of sale or lease and thereafter) that the Vehicles contained the electronic power steering torque assist sensor defect, concealed the defect, and never intended to repair or replace the electronic power steering torque assist defect during the relevant warranty periods. To date, GM has not provided Plaintiffs or the class members with a repair or remedy that will eliminate the electronic power steering torque assist defect.

227.   GM owed a duty to disclose the electronic power steering torque assist

defect and its corresponding safety hazard to Plaintiffs and the class members because GM possessed superior and exclusive knowledge regarding the defect. Rather than disclose the defect, GM intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Vehicles and the presence of the electronic power steering torque assist defect, to sell additional Vehicles and avoid the cost of repair or replacement.

228.   The fact that the Power Steering Assist defect causes Class Vehicles to abruptly lose power is material because Plaintiffs and the class members had a reasonable expectation that the vehicles would not expose them and other vehicle occupants to such a safety hazard. No reasonable consumer expects a vehicle to be designed, manufactured and assembled such that that a defect manifests causing a significant and abrupt reduction of the power steering assist, making turning of the steering wheel difficult.

229.   Plaintiffs and the class members would not have purchased or leased the Class Vehicles but for GM's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Power Steering Assist defect or would have paid less for the Class Vehicles.

230.   GM knew its concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts. GM knew its concealment and suppression of the Power Steering Assist defect would sell more

Class Vehicles and would discourage Plaintiffs and the class members from seeking replacement or repair of the Power Steering Assist defect. Further, GM intended to induce Plaintiffs and the class members into purchasing or leasing the Class Vehicles and to discourage them from seeking repair of the Power Steering Assist defect, in order to decrease costs and increase profits.

231.   GM acted with malice, oppression and fraud.

232.   Plaintiffs and the class members reasonably relied upon GM's knowing concealment and omissions. As a direct and proximate result of GM's omissions and active concealment of material facts regarding the Power Steering Assist defect and associated safety hazard, Plaintiffs and the class members have suffered actual damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and the State Subclasses)**

233.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint to the extent not inconsistent with the claims asserted in this Count.

234.   This claim is asserted in the alternative on behalf of Plaintiffs and the members of the Classes to the extent that there is any determination that Plaintiffs do not have standing to assert any contractual claims asserted against GM on the alleged basis of absence of contractual privity or otherwise.

235.  By its wrongful acts and omissions described herein, including selling the Vehicles with defective electronic power steering torque assist sensors, GM was unjustly enriched at the expense of Plaintiffs and the Classes.

236.  Plaintiffs and the class members conferred a benefit upon GM by purchasing the Vehicles at the full price for fully functional vehicles equipped with appropriate and working electronic power steering torque assist sensors.

237.  GM knew that the Classes were purchasing the Vehicles and still accepted the sum contemplated for fully functional vehicles equipped with appropriate and working electronic power steering torque assist sensors.

238.  Under the circumstances, it would be inequitable for GM to retain the profits, benefits, and other compensation obtained through its wrongful conduct in manufacturing, marketing and selling the Vehicles with defective electronic power steering torque assist sensor to Plaintiffs and the Classes. Natural justice and equity require that Plaintiffs and the Classes recover under the circumstances.

239.  Plaintiffs, on behalf of themselves and all others similarly situated, seek restitution from GM, and an order of this Court proportionally disgorging all profits, benefits, and other compensation wrongfully obtained by GM from its conduct.

**EIGHTH CAUSE OF ACTION**
**Violations of the California Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code §§ 1750—1785)**
**(By Plaintiffs Faussett, Lutsk, and Magallanes on Behalf of the**
**California Subclass)**

240.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

241.   Plaintiffs Faussett, Lutsk, and Magallanes bring this claim on behalf of themselves and the California Subclass.

242.   Defendants are "persons" within the meaning of Cal. Civ. Code § 1761(c).

243.   Plaintiffs Faussett, Lutsk, and Magallanes, as well as members of the California Subclass, are "consumers" as defined under Cal. Civ. Code § 1761(d).

244.   Class Vehicles are "goods" as defined under Cal. Civ. Code § 1761(a).

245.   The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

246.   GM engaged in unfair and/or deceptive acts in violation of the CLRA principally because it intentionally or negligently concealed and suppressed material facts concerning the defect resulting in sudden loss of power steering in the Class Vehicles. GM did so by failing to disclose the known risk of the defect,  denying warranty claims arising from the defect, and denying the existence of the defect even while admitting it in other vehicles of the same and model with different dates of

manufacture. GM's conduct violated at least the following enumerated CLRA provisions:

a. GM represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of § 1770(a)(5);

b. GM represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of § 1770(a)(7);

c. GM advertises its Class Vehicles with the intent not to sell them as advertised, which is in violation of § 1770(a)(9);

d. GM represents that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of § 1770(a)(16); and

e. GM inserts an unconscionable provision into its warranty in violation of § 1770(a)(19).

247. GM's unfair and/or deceptive acts or practices repeatedly occurred in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and created a serious safety hazard for the public.

248.   GM knew, should have known, or was reckless in not knowing that the Class Vehicles were defective, the power steering would abruptly fail without warning, and were not suitable for their intended use.

249.   GM was under a duty to Plaintiffs Faussett, Lutsk, and Magallanes and the California Subclass members to disclose the defective nature of the Class Vehicles and the defect because, among other things, auto manufacturers have a duty to consumers to disclose safety defects and because GM had superior and exclusive knowledge of the defect.

250.   The facts that GM misrepresented to and concealed from Plaintiffs Faussett, Lutsk, and Magallanes and the other California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease their Class Vehicles or pay a lesser price for them.

251.   The defect poses a serious safety risk and affects the central functionality of the vehicle because a vehicle that suddenly loses power steering cannot be safely and reliably driven.

252.   In failing to disclose the material defect, GM has knowingly and intentionally concealed material facts in breach of its duty to disclose.

253.   Plaintiffs Faussett, Lutsk, and Magallanes and the California Subclass have suffered injury in fact and actual damages resulting from GM's material

misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the defect. Had Plaintiffs Faussett, Lutsk, and Magallanes and the California Subclass known about the defective nature of the Class Vehicles and the defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

254.   As a direct and proximate result of GM's unfair and deceptive conduct, therefore, Plaintiffs Faussett, Lutsk, and Magallanes and the California Subclass have been harmed.

255.   This cause of action seeks injunctive relief and monetary damages. Plaintiffs Faussett, Lutsk, and Magallanes – on behalf of themselves and the California Subclass – sent a demand letter to Defendant via certified mail on or about Jun 26, 2020, pursuant to the requirements of the CLRA in order to provide the notice required by Cal. Civ. Code § 1782(a), and delivered on July 2, 2020.  The CLRA letter advised Defendant that it is in violation of the CLRA and must correct, replace or otherwise remedy the Class Vehicles alleged to be in violation of Cal. Civ. Code § 1770 as a result of the defect. Defendant was further advised therein that in the event the relief requested was not provided within thirty (30) days, Plaintiffs would amend the complaint to include a CLRA claim with a request for monetary damages. Over 30 days have now passed, and Defendant did not correct,

replace, or otherwise remedy the Class Vehicles and issues alleged in Plaintiffs' CLRA notice or this complaint within the statutorily prescribed 30-day period. Plaintiffs, therefore, seek both injunctive relief and monetary damages (including compensatory and punitive damages) against Defendant pursuant to the CLRA, Cal. Civ. Code §§ 1781 and 1782.

256.   Plaintiffs further seek an order awarding costs of court and attorneys' fees pursuant to Cal. Civ. Code § 1780(e).

257.   Plaintiffs Faussett, Lutsk, and Magallanes' CLRA venue declarations are attached hereto as Exhibit 23 in accordance with Cal. Civ. Code §§ 1780(d).

## NINTH CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")

### (Cal. Bus. & Prof. Code §§ 17200-17210)

### (Plaintiffs Faussett, Lutsk, and Magallanes on Behalf of the California Subclass)

258.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

259.   Plaintiffs Faussett, Lutsk, and Magallanes bring this claim individually and on behalf of the California Subclass.

260.   The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue

or misleading advertising." Cal. Bus. & Prof. Code § 17200. GM's conduct violates each of these prohibitions.

**Unlawful Conduct**

261.   GM's conduct is unlawful because, as set forth herein, it violates the Song-Beverly Consumer Warranty Act and the CLRA, among other laws.

262.   Despite GM's knowledge of the defect, it sold the Class Vehicles to Plaintiffs Faussett, Lutsk, and Magallanes, and the California Subclass; refused to notify Plaintiffs Faussett, Lutsk, and Magallanes, and the California Subclass of the defect; and refused to remediate the Class Vehicles to eliminate the defect.

**Unfair Conduct**

263.   GM's conduct is unfair because it violated California's public policy, including that legislatively declared in the Song-Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The defect impedes safe and reliable driving of the Class Vehicles.

264.   GM acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

  a.   Selling Plaintiffs and California Subclass members defective Class Vehicles;

  b.   Failing to disclose the defect despite the opportunity to do so in numerous locations that people in the market for a vehicle would be likely to encounter;

c. Failing to disclose the defect when it conducted an unduly narrow recall;

d. Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the defect during the warranty period;

e. Failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

f. Failing to acknowledge the scope and severity of the defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective and failing to provide adequate relief to Plaintiffs and California Subclass members.

265. The gravity of the harm resulting from GM's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

266. There are reasonably available alternatives that would further GM's business interests in increasing sales and preventing false warranty claims. For example, GM could have: (a) acknowledged the defect and provided a permanent, effective fix for the defect, and/or (b) disclosed the defect prior to prospective consumers' purchases.

267. The harm from GM's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent defect, and GM has failed

to disclose it. Plaintiffs Faussett, Lutsk, and Magallanes, and the California Subclass did not know of and had no reasonable means of discovering the defect.

**Fraudulent Conduct**

268.   GM's conduct is fraudulent in violation of the UCL. GM's fraudulent acts include knowingly and intentionally concealing from Plaintiffs' Faussett, Lutsk, and Magallanes, and the California Subclass the existence of the defect and falsely marketing and misrepresenting the Class Vehicles as being functional and not possessing a defect that impedes safe and reliable driving.

269.   GM's misrepresentations and omissions alleged herein caused Plaintiffs and the California Subclass to purchase or lease their Class Vehicles or pay more than they would have had GM disclosed the defect.

270.   At all relevant times, GM had a duty to disclose the defect because it had superior and exclusive knowledge of the defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because GM made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the defect.

271.   Accordingly, Plaintiffs Faussett, Lutsk, and Magallanes, and the California Subclass have suffered injuries in fact, including lost money or property, as a result of GM's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiffs Faussett, Lutsk, and Magallanes, and the California Subclass would not

have purchased or leased their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

272.    Plaintiffs Faussett, Lutsk, and Magallanes, and the California Subclass seek appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin GM from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore Plaintiffs and the California Subclass any money GM acquired by its unfair competition, including restitution. Plaintiffs also seek reasonable attorneys' fees and expenses under applicable law.

**TENTH CAUSE OF ACTION**
**Violations of the Connecticut Unfair Trade Practices Act**
**(Conn. Gen. Stat. § 42-110a, *et seq.*)**
**(By Plaintiff Meir on Behalf of the Connecticut Subclass)**

273.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

274.    Plaintiff Meir brings this claim on behalf of himself and the Connecticut Subclass.

275.    GM is a "person" within the meaning of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a(3), and conduct "trade" and "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

276.    Plaintiff Meir and members of the Connecticut Subclass are "persons" within the meaning of the CUTPA, Conn. Gen. Stat. § 42-110a(3).

277.    In the course of GM's business, GM intentionally engaged in deceptive

practices by suppressing material facts concerning the defect in the power steering system of the Class Vehicles including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

278.  GM thus violated the CUTPA, at a minimum by:

a) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

b) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

c) advertising the Class Vehicles with the intent not to sell them as advertised;

d) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and

e) otherwise engaging in deceptive practices prohibited under Conn. Gen. Stat. § 42-110b.

279.  GM intentionally and knowingly misrepresented material facts regarding the safety of the Class Vehicles with intent to mislead Plaintiff and the Connecticut Subclass.

280.  GM knew or should have known that its conduct violated the CUTPA.

281.   GM owed Plaintiff and Connecticut class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it:

a) possessed exclusive knowledge of the defect;

b) intentionally concealed the defect from consumers; and

c) made incomplete or negligent representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the Connecticut Subclass.

282.   GM's acts and omissions have also been unfair because they violated public policy since the defect impedes safe and reliable driving of the Class Vehicles. GM acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

a) selling Plaintiff Meir and Connecticut Subclass members defective Class Vehicles;

b) failing to adequately remedy the defect during the warranty period;

c) failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

d) failing to provide adequate relief to Plaintiff and Connecticut Subclass members.

283.   The gravity of the harm resulting from GM's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles

without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

284.   There are reasonably available alternatives that would further GM's business interests in increasing sales and preventing false warranty claims. For example, GM could have:

(a) acknowledged the defect and provided a permanent, effective fix for the defect;

(b) disclosed the defect prior to prospective consumers' purchases; and/or

(c) disclosed the defect when it conducted an unduly narrow recall.

285.   GM intentionally and knowingly misrepresented material facts regarding the safety of the Class Vehicles with intent to mislead Plaintiff and the Connecticut Subclass.

The harm from GM's unfair conduct was not reasonably avoidable byconsumers. The Class Vehicles all suffer from the latent defect, and GM has failed to disclose it. Plaintiff Meir and the Connecticut Subclass did not know of and had no reasonable means of discovering the defect.

286.   GM intentionally and knowingly misrepresented material facts regarding the safety of the Class Vehicles with intent to mislead Plaintiff and the Connecticut Subclass.

287.   Plaintiff and Connecticut Subclass members suffered ascertainable loss

and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Connecticut Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff Meir paid $1,400 in costs repairing the defect and also suffered diminished use and value of his vehicle.

288.   GM's violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

289.   As a direct and proximate result of GM's actions described above, Plaintiff and the Connecticut Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, punitive damages, and reasonable attorneys' fees, pursuant to Conn. Gen. Stat. § 42-110g.

**ELEVENTH CAUSE OF ACTION**
**Violations of the Florida Unfair and Deceptive Trade Practices Act**
**(Fla. Stat. § 501.201, *et seq.*)**
**("FDUTPA")**
**(By Plaintiff Barnes on Behalf of the Florida Subclass)**

290.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

291.   Defendants conduct "trade or commerce" within the meaning of the Florida Unfair and Deceptive Trade Practices Act (FUDTPA), Fla. Stat. § 501.203(8).

292.   Plaintiff Barnes and members of the Florida Subclass are "consumers" within the meaning of FUDTPA, Fla. Stat. § 501.203(7).

293.   GM has violated the FUDTPA's prohibition on unfair and deceptive acts in the conduct of trade of commerce in that it used unconscionable business practices by failing to disclose, at the point of sale or otherwise, that the power steering systems in Class Vehicles are defective and pose a safety hazard. Defendants failed to disclose the known risk of the sudden loss of power steering without warning and denied warranty claims arising from the Defect.

294.   Defendants thus violated the FUDTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

295.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Florida Subclass.

296.   GM knew or should have known that its conduct violated the FUDTPA.

297.   Defendants owed Plaintiff and Florida class members a duty to disclose all the facts concerning the reliability of the Class Vehicles because it: (1) possessed exclusive knowledge of the defect, including at the time of manufacture when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving, from complaints to NHTSA and web forums actively monitored by GM, and from GM's internal analyses that determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder; (2) intentionally concealed the defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the Florida Subclass.

298.   Defendant's acts and omissions have also been unfair because they violated public policy since the defect impedes safe and lawful driving of the Class Vehicles. GM acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following aspects: (1) selling Plaintiff Barnes and Florida Subclass

members defective Class Vehicles; (2) failing to disclose the defect despite the opportunity to do so in numerous locations that people in the market for a vehicle would be likely to encounter; (3) directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the defect during the warranty period; (4) failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and (5) failing to acknowledge the scope and severity of the defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles as defective, and failing to provide adequate relief to Plaintiff and Florida Subclass members.

299.   The gravity of the harm resulting from GM's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

300.   There are reasonably available alternatives that would further GM's business interests in increasing sales and preventing false warranty claims. For example, GM could have (1) acknowledged the defect and provided a permanent, effective fix, and/or (2) disclosed the defect prior to prospective consumers' purchases.

301.   The harm from GM's unfair conduct was not reasonably avoidable by consumers. Plaintiff Barnes and the Florida Subclass did not know of and had no reasonable means of discovering the defect.

302.   Plaintiff and Florida Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Florida Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or if the Vehicle's true nature had been disclosed would have paid significantly less for them.

303.   Defendant's violations present a continuing risk to Plaintiff and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

304.   As a direct and proximate result of GM's actions described above, Plaintiff and the Florida Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages and attorneys' fees, pursuant to Fla. Stat. § 501.211 and Fla. Stat. § 501.2105.

## TWELFTH CAUSE OF ACTION
### Violations of the Illinois Consumer Fraud and Deceptive Business Practice Act
### (815 ILCS 505, *et seq.*)
### (By Plaintiff Grujic on Behalf of the Illinois Subclass)

305.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

306.    Defendants are "persons" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practice Act (ICFA), 815 Ill. Comp. Stat. 505/1(c), and conduct "trade" and "commerce" within the meaning of 815 Ill. Comp. Stat. 505/1(f).

307.    Plaintiff Grujic and members of the Illinois Subclass are "consumers" within the meaning of the ICFA, 815 Ill. Comp. Stat. 505/1(e).

308.    GM has violated the ICFA's prohibition on deceptive conduct in that it used unconscionable business practices by failing to disclose, at the point of sale or otherwise, that the power steering systems in Class Vehicles are defective and pose a safety hazard. Defendants accomplished this by failing to disclose the known risk of the sudden loss of power steering without warning and denying warranty claims arising from the defect.

309.    Defendants thus violated the ICFA, at a minimum by (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning

the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

310. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Illinois Subclass including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

311. GM knew or should have known that its conduct violated the ICFA.

312. Defendants owed Plaintiff and Illinois class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it: (1) possessed knowledge of the defect; (2) intentionally concealed the defect from consumers; and (3) made incomplete or negligent representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the Illinois subclass.

313. Defendant's acts and omissions have also been unfair because they violated public policy since the defect impedes safe and lawful driving of the Class Vehicles. GM acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects: (1) selling Plaintiff Grujic and Illinois Subclass

members defective Class Vehicles; (2) failing to adequately remedy the defect during the warranty period; (3) failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and (4) failing to provide adequate relief to Plaintiff and Illinois Subclass members.

314.   The gravity of the harm resulting from GM's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

315.   There are reasonably available alternatives that would further GM's business interests in increasing sales and preventing false warranty claims. For example, GM could have: (1) acknowledged the defect and provided a permanent, effective fix for the defect, and/or (2) disclosed the defect prior to prospective consumers' purchases.

316.   The harm from GM's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent defect, and GM has failed to disclose it. Plaintiff Grujic and the Illinois Subclass did not know of and had no reasonable means of discovering the defect.

317.   Plaintiff and Illinois Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Illinois

Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff Grujic paid $1,900 in costs repairing the defect and also suffered diminished use and value of his vehicle.

318.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

319.   Based on the foregoing, Plaintiff Grujic and the Illinois Subclass are entitled to all remedies available pursuant to the IFCA, including monies paid as a result of the defect, actual damages, punitive damages, attorneys' fees, and other reasonable costs.

**THIRTEENTH CAUSE OF ACTION**
**Violations of the Michigan Consumer Protection Act ("MCPA")**
**Michigan Comp. Laws Ann., § 445.903** *et seq.*
**(By Plaintiff Woronko on Behalf of the Michigan Subclass)**

320.   Plaintiff, individually and for the Michigan Subclass, hereby incorporates each and every allegation as though fully set forth herein.

321.   Plaintiff brings this claim individually and on behalf of the Michigan Subclass.

322.   Plaintiff and Class Members who purchased or leased Class Vehicles are "consumers" under MCPA.

323.   The Class Vehicles are consumer goods within the meaning of the MCPA and provided services within the MCPA's meaning of the term consumer services.

324.   The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

325.   GM violated the MCPA by, among other things, engaging in the following unfair deceptive acts or practices:

    a.   Failing to disclose material facts that deceived and had the tendency to deceive; and

    b.   Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) the promotion or sale of consumer goods or services; or (ii) the subsequent performance of a merchant with respect to an agreement of sale or lease.

326.   GM violated the MCPA by concealing, suppressing or omitting material facts regarding the Vehicles, including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor fails prematurely, and that the cost of replacing or repairing the defective electronic

power steering torque assist sensor is high.  This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase, or how much to pay for, the Vehicles.

327.   GM concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff and the Michigan Class would rely on the omissions in the purchase or lease of their Vehicles.

328.   To this day, GM continues to violate the MCPA by actively concealing the material information about the Vehicles and their electronic power steering torque assist sensor and by representing to Plaintiff and members of the Michigan Class that the Vehicles are defect-free and safe.

329.   GM intended that Plaintiff and the Michigan Class members would rely on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

330.   Defendant's practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

a.   At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff and Class Members the defective electronic power steering torque assist sensor and the associated Power Steering Assist defect.

b.     Thereafter, Defendant failed to disclose the defect to Plaintiff and the Class Members, either through warnings or recall notices, and/or actively concealed from them that the Class Vehicles' electronic power steering torque assist sensors were defective, even though the company knew of such defects: (1) at the time of manufacture, when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving; (2) from complaints to NHTSA and to web forums actively monitored by GM; (3) when, on information and belief, GM's internal analyses determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder.

c.     Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the electronic power steering torque assist sensor on the Class Vehicles would be compromised and that the Class Vehicles would have the Power Steering Assist defect.

d.     Nonetheless, Defendant forced Plaintiff and Class Members to expend money at its dealerships on diagnosis and ineffectual repairs and part replacements on the Class Vehicles, despite Defendant's prior knowledge of the defect.

e.     Defendant, in administering its limited warranty, engaged in

materially misleading deceptive acts and practices by classifying the defect as not involving the powertrain, but rather, other parts, so as to place the defect outside of warranty coverage. When Defendant did cover electronic power steering torque assist sensor repairs and replacements under the warranty, it replaced the defective part with equally defective units.

331. Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

332.  Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.  Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the Class Vehicles.

333.  Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

334.  As a direct and proximate result of these unfair acts or practices, Plaintiff and Class Members have been damaged because: they purchased Class

Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, paid for diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, GM has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

335.   Plaintiff and Class Members seek restitution of the substantial sums of money they expended to diagnose and repair the defect in their Class Vehicles, which Defendant knew about prior to their sale.

336.   Plaintiff and Class Members also seek appropriate equitable relief, including an order requiring GM to adequately disclose and remediate the defect and an order enjoining GM from incorporating the defective electronic power steering torque assist sensor into its vehicles in the future.

<u>**FOURTEENTH CAUSE OF ACTION**</u>
**Violations of the New Jersey Consumer Fraud Act**
**(N.J. Stat. § 56:8-1, *et. seq.*)**
**(By Plaintiff Ambrose on Behalf of the New Jersey Subclass)**

337.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

338.   Plaintiff Ambrose brings this claim on behalf of himself and the New Jersey Subclass.

339.    Defendants are "persons" within the meaning of the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. § 56:8-1(d) and conduct "advertisements" and "sales" within the meaning of N.J. Stat. § 56:8-1(a) and N.J. Stat. § 56:8-1(e).

340.    Plaintiff Ambrose and members of the New Jersey Subclass are "persons" within the meaning of the NJCFA, N.J. Stat. § 56:8-1(d).

341.    In the course of GM's business, GM intentionally or negligently concealed and suppressed material facts concerning the defect affecting the power steering of the Class Vehicles including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

342.    Defendants thus violated the NJCFA, at a minimum by (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

343. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Jersey Subclass.

344. GM knew or should have known that its conduct violated the NJCFA.

345. Defendants owed Plaintiff and New Jersey class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it: (1) possessed knowledge of the defect from several sources, including at the time of manufacture when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving, from complaints to NHTSA and to web forums actively monitored by GM, and from GM's internal analyses determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder; (2) intentionally concealed the defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the New Jersey Subclass.

346. Plaintiff and New Jersey Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the New Jersey Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been

disclosed—would have paid significantly less for them. Plaintiff has suffered diminished use and value of his vehicle.

347. Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated. To this day, GM continues to violate the NJCFA by actively concealing the material information about the Vehicles and their electronic power steering torque assist sensor and by representing to Plaintiff and members of the New Jersey Class that the Vehicles are defect-free and safe.

348. As a direct and proximate result of GM's actions described above, Plaintiff and the New Jersey Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, treble damages, reasonable attorneys' fees, and any other appropriate relief pursuant to N.J. Stat. § 56:8-19.

**FIFTEENTH CAUSE OF ACTION**
**Violations of the New York General Business Law**
**(New York Gen. Bus. Law § 349, *et. seq.*)**
**(By Plaintiff Kobel on Behalf of the New York Subclass)**

349. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

350. Plaintiff Kobel brings this claim on behalf of himself and the New York Subclass.

351.   Defendants conduct "business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

352.   Plaintiff Kobel and members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

353.   In the course of GM's business, GM intentionally or negligently concealed and suppressed material facts concerning the defect affecting the power steering of the Class Vehicles including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

354.   Defendants thus violated N.Y. Gen. Bus. Law § 349, at a minimum by: (1) causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles; (2) representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have; (3) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (4) advertising the Class Vehicles with the intent not to sell or lease them as advertised; (5) engaging in other conduct which created a likelihood of confusion or of misunderstanding; and (6) using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of

a material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

355.  GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New York Subclass.

356.  GM knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 349.

357.  Defendants owed Plaintiff and New York class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it: (1) possessed knowledge of the defect from several sources, including at the time of manufacture when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving, from complaints to NHTSA and to web forums actively monitored by GM, and from GM's internal analyses determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder; (2) intentionally concealed the defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the New York Subclass.

358.   Plaintiff and New York Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the New York Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff Kobel paid $1,425 in costs repairing the defect and also suffered diminished use and value of his vehicle.

359.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

360.   As a direct and proximate result of GM's actions described above, Plaintiff and the New York Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, punitive damages, reasonable attorneys' fees, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

### SIXTEENTH CAUSE OF ACTION
**Violations of the South Carolina Unfair Trade Practices Act**
**(S.C. Code Ann. § 39-5-10, *et. seq.*)**
**(By Plaintiff Cirignano on Behalf of the South Carolina Subclass)**

361.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

362.   Plaintiff Cirignano brings this claim on behalf of himself and the South Carolina Subclass.

363.   Defendants are "persons" within the meaning of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10(a) and conduct "trade" and "commerce" within the meaning of S.C. Code Ann. § 39-5-10(b).

364.   Plaintiff Cirignano and South Carolina Subclass members are "persons" within the meaning of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10(a).

365.   In the course of GM's business, GM intentionally or negligently concealed and suppressed material facts concerning the defect affecting the power steering systems of the Class Vehicles including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

366.   Defendants thus violated the SCUTPA by (1) causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles; (2) representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have; (3) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (4) advertising the

Class Vehicles with the intent not to sell or lease them as advertised; (5) engaging in other conduct which created a likelihood of confusion or of misunderstanding; and (6) using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

367.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the South Carolina Subclass.

368.   GM knew or should have known that its conduct violated the SCUTPA.

369.   Defendants owed Plaintiff and South Carolina class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it: (1) possessed knowledge of the defect from several sources, including at the time of manufacture when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving, from complaints to NHTSA and to web forums actively monitored by GM, and from GM's internal analyses determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder; (2) intentionally

concealed the defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the South Carolina Subclass.

370.   Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.   Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the Class Vehicles.

371.   Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

372.   Plaintiff and South Carolina Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the South Carolina Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them.

373.   As a direct and proximate result of GM's actions described above, Plaintiff and the South Carolina Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, treble damages,

reasonable attorneys' fees, and any other appropriate relief pursuant to S.C. Code Ann. § 39-5-140.

**SEVENTEENTH CAUSE OF ACTION**
**Violations of the South Dakota Deceptive Trade Practices and Consumer Protection Law**
**( S.D. Codified Laws. § 37-24-35, *et. seq.*)**
**(By Plaintiff Overturf on Behalf of the South Dakota Subclass)**

374.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

375.   Plaintiff Overturf brings this claim on behalf of himself and the South Dakota Subclass.

376.   Defendants are "persons" within the meaning of the South Dakota Deceptive Trade Practices and Consumer Protection Law ("SDCPA"), S.D. Codified Laws § 37-41-1(8) and conduct "trade" and "commerce" within the meaning of S.D. Codified Laws § 37-41-1(13).

377.   Plaintiff Overturf and South Dakota Subclass are "persons" within the meaning of the SDCPA, S.D. Codified Laws § 37-41-1(8).

378.   In the course of GM's business, GM intentionally or negligently concealed and suppressed material facts concerning the defect affecting the power steering systems of the Class Vehicles including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor

fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

379.   Defendants thus violated the SDCPA by (1) causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles; (2) representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have; (3) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (4) advertising the Class Vehicles with the intent not to sell or lease them as advertised; (5) engaging in other conduct which created a likelihood of confusion or of misunderstanding; and (6) using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

380.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the South Dakota Subclass.

381.   GM knew or should have known that its conduct violated the SDCPA.

382.   Defendants owed Plaintiff and South Dakota class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles

because it: (1) possessed knowledge of the defect from several sources, including at the time of manufacture when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving, from complaints to NHTSA and to web forums actively monitored by GM, and from GM's internal analyses determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder; (2) intentionally concealed the defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the South Dakota Subclass.

383.   Plaintiff and South Dakota Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the South Dakota Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them.

384.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

385.   As a direct and proximate result of GM's actions described above, Plaintiff and the South Dakota Subclass members have been injured in fact and

suffered damages, and seek relief in the form of actual damages and any other just and proper relief available under S.D. Codified Laws § 37-24-31.

### EIGHTEENTH CAUSE OF ACTION
**Violations of the Washington Consumer Protection Act**
**(Wash. Rev. Code. 19.86, *et seq*.)**
**(By Plaintiff Chapman on Behalf of the Washington Subclass)**

386.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

387.   Plaintiff Chapman brings this claim on behalf of himself and the Washington Subclass.

388.   Defendants are "persons" within the meaning of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010(1), and conduct "trade" and "commerce" within the meaning of the WCPA, WRC § 19.86.010(2).

389.   Plaintiff Chapman and members of the Washington Subclass are "persons" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(1).

390.   In the course of GM's business, GM intentionally or negligently concealed and suppressed material facts concerning the defect affecting the power steering systems of the Class Vehicles including, but not limited to, the fact that the Vehicles' electronic power steering torque assist sensor is defective, that as a result of such defect, the Vehicles' defective electronic power steering torque assist sensor

fails prematurely, and that the cost of replacing or repairing the defective electronic power steering torque assist sensor is high.

391.   Defendants thus violated the WCPA by (1) causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles; (2) representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have; (3) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (4) advertising the Class Vehicles with the intent not to sell or lease them as advertised; (5) engaging in other conduct which created a likelihood of confusion or of misunderstanding; and (6) using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

392.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Washington Subclass.

393.   GM knew or should have known that its conduct violated the WCPA.

394.   Defendants owed Plaintiff and Washington class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles

because it: (1) possessed knowledge of the defect from several sources, including at the time of manufacture when it created the electronic power steering torque assist sensor in a manner unable to provide for consistently stable driving, from complaints to NHTSA and to web forums actively monitored by GM, and from the GM internal analyses that determined the ubiquity of the problem upon learning that the power steering torque assist sensors were on backorder; (2) intentionally concealed the defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the Washington Subclass.

395.   Defendant's acts and omissions have also been unfair because they violated public policy since the defect impedes safe and lawful driving of the Class Vehicles. GM acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects: (1) selling Plaintiff Chapman and Washington Subclass members defective Class Vehicles; (2) failing to disclose the defect despite the opportunity to do so in numerous locations that people in the market for a vehicle would be likely to encounter; (3) directing and furnishing replacement parts it knew would not adequately remedy the defect and otherwise failing to adequately remedy the defect during the warranty period; (4) failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and (5) failing to acknowledge the scope and severity of the defect, which poses serious

safety concerns, refusing to acknowledge the Class Vehicles are defective and failing to provide adequate relief to Plaintiffs and Washington Subclass members.

396.  The gravity of the harm resulting from GM's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

397.  .There are reasonably available alternatives that would further GM's business interests in increasing sales and preventing false warranty claims. For example, GM could have: (1) acknowledged the defect and provided a permanent, effective fix for the defect, and/or (2) disclosed the defect prior to prospective consumers' purchases.

398.  The harm from GM's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent defect, and GM has failed to disclose it. Plaintiff Chapman and the Washington Subclass did not know of and had no reasonable means of discovering the defect.

399.  Plaintiff and Washington Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of GM's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Washington Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had

been disclosed—would have paid significantly less for them. Plaintiff Chapman paid $1,350 in costs repairing the defect and also suffered diminished use and value of his vehicle.

400.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

401.   As a direct and proximate result of GM's actions described above, Plaintiff and the Washington Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, treble damages, and reasonable attorneys' fees pursuant to Wash. Rev. Code § 19.86.090.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a.    For an order certifying the proposed classes and appointing Plaintiffs and Plaintiffs' counsel to represent the classes;

b.    For an order awarding Plaintiffs and class members actual, statutory, punitive, and/or any other form of damages provided by and pursuant to the statutes cited above;

c.    For an order awarding Plaintiffs and the class members restitution, disgorgement and/or any other declaratory, injunctive, or equitable relief provided by and pursuant to the statutes cited above or

as the Court deems proper, including the repair of all Class Vehicles, replacement or repurchase of all Class Vehicles, and/or the refund of money paid to own or lease all Class Vehicles;

  d. For an order or orders requiring GM to adequately disclose and remediate the Power Steering Assist defect and enjoining GM from incorporating the defective powertrain into its vehicles in the future;

  e. For an order awarding Plaintiffs and the class members pre-judgment and post-judgment interest;

  f. For an order awarding Plaintiffs and class members reasonable attorney fees and costs of suit, including expert witness fees; and

  g. For an order awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

  The Plaintiffs and the Class(es) hereby demand a jury trial on all issues so triable.

DATED: October 23, 2020   Respectfully submitted,

         */s/ E. Powell Miller*
         E. Powell Miller (P39487)
         Sharon S. Almonrode (P33938)
         Dennis A. Lienhardt (P81118)
         William Kalas (P82113)
         **THE MILLER LAW FIRM, P.C.**

950 West University, Suite 300
Rochester, Michigan 48307
Tel: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

Nicholas A. Migliaccio
(Michigan Bar No. 29077)
Jason S. Rathod
(Michigan Bar No. 18424)
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Daniel E. Gustafson
Daniel C. Hedlund
David A. Goodwin
Mickey L. Stevens
**GUSTAFSON GLUEK PLLC**
220 South Sixth Street #2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
mstevens@gustafsongluek.com

*Attorneys for the Plaintiffs and Putative Class*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify, that on October 23, 2020 I electronically filed the foregoing with the Clerk of the Court using the ECF system which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Tel: (248) 841-2200
epm@millerlawpc.com
