UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT AMBROSE, SCOTT BARNES, RICHARD     Case No. 19-13449
CHAPMAN, RYAN CIRIGNANO, CHRIS FAUSSETT,
MILAN GRUJIC, DAVID KELLER, JOHN KOBEL,     Sean F. Cox
DANIEL LAWSON, STEPHEN LUTSK, LORI     United States District Judge
MAGALLANES, NOAM MEIER, ERIC OSTRANDER,
ROBERT OVERTURF, and MIKE WORONKO, on
behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

GENERAL MOTORS LLC,

        Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS (ECF No. 30)

In this putative class action, fifteen named plaintiffs bring a variety of statutory and

common-law claims against Defendant General Motors, LLC ("GM") arising out of an alleged

safety defect in the power steering assist in model year ("MY") 2015 and 2016 Chevrolet Colorado

and GMC Canyon trucks. (*See* ECF No. 26, ¶¶ 1-3).

The matter currently before the Court is GM's Motion to Dismiss First Amended Class

Action Complaint and to Strike Class Allegations (ECF No. 30). The motion has been fully briefed,

and the Court concludes that oral argument is not necessary. Thus, the Court orders that the motion

will be decided without a hearing. *See* E.D. Mich. LR 7.1(f). For the reasons explained below, the

Court **GRANTS** GM's motion and **DISMISSES** this action.

## BACKGROUND

On November 21, 2019, Plaintiffs initiated this action. (ECF No. 1). On October 23, 2020, Plaintiffs Robert Ambrose ("Ambrose"), Scott Barnes ("Barnes"), Richard Chapman ("Chapman"), Ryan Cirignano ("Cirignano"), Chris Faussett ("Faussett"), Milan Grujic ("Grujic"), David Keller ("Keller"), John Kobel ("Kobel"), Daniel Lawson ("Lawson"), Stephen Lutsk ("Lutsk"), Lori Magallanes ("Magallanes"), Noam Meier ("Meier"), Eric Ostrander ("Ostrander"), Robert Overturf ("Overturf"), and Mike Woronko ("Woronko"), on behalf of themselves and all others similarly situated (collectively "Plaintiffs") filed their First Amended Class Action Complaint (the "Amended Complaint"). (ECF No. 26). As such, that pleading supersedes the original complaint.

### The Claims

The Amended Complaint is organized by the claims brought on behalf of the Nationwide Class or alternatively on behalf of the state sub-classes (Counts 1-3 and Counts 4-7) and those brought on behalf of the individual state sub-classes: the California Sub-Class (Counts 4-5 and Counts 8-9), the Connecticut Sub-Class (Count 10), the Florida Sub-Class (Count 11), the Illinois Sub-Class (Count 12), the Michigan Sub-Class (Count 13), the New Jersey Sub-Class (Count 14), the New York Sub-Class (Count 15), the South Carolina Sub-Class (Count 16), the South Dakota Sub-Class (Count 17), and the Washington Sub-Class (Count 18).

The claims brought on behalf of the Nationwide Class or alternatively on behalf of the state sub-classes are a violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq*.) ("MMWA") (Count 1), breach of express warranty (Count 2), breach of implied warranty (Counts 3), fraudulent concealment (Count 6), and unjust enrichment (Count 7).

The claims brought on behalf of the California Sub-Class are a breach of express and implied warranties under California's Song-Berverly Consumer Warranty Act (Cal. Civ. Code §§ 1790-1795.8) (Counts 4-5), violations of the California Legal Remedies Act (Cal. Civ. Code §§ 1750-1785) ("CLRA") (Count 8), violations of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200-17210) ("UCL") (Count 9).

The claim brought on behalf of the Connecticut Sub-Class is a violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq*.) (Count 10).

The claim brought on behalf of the Florida Sub-Class is a violation of the Florida Unfair and Deceptive Trade Practices Act (Fla. Stat. § 501.201, *et seq*.) (Count 11).

The claim brought on behalf of the Illinois Sub-Class is a violation of the Illinois Consumer Fraud and Deceptive Business Practice Act (815 ILCS 505, *et seq*.) (Count 12).

The claim brought on behalf of the Michigan Sub-Class is a violation of the Michigan Protection Act (Mich. Comp. Laws Ann., § 445.903, *et seq*.) ("MCPA") (Count 13).

The claim brought on behalf of the New Jersey Sub-Class is a violation of the New Jersey Consumer Fraud Act (N.J. Stat. § 56:8-1, *et seq*.) (Count 14).

The claim brought on behalf of the New York Sub-Class is violations of the New York General Business Law (N.Y. Gen. Bus. Law § 349, *et seq*.) (Count 15).

The claim brought on behalf of the South Carolina Sub-Class is violations of the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10, *et seq*.) (Count 16).

The claim brought on behalf of the South Dakota Sub-Class is a violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws § 37-24-35, *et seq*.) (Count 17).

The claim brought on behalf of the Washington Sub-Class is a violation of the Washington Consumer Protection Act (Wash. Rev. Code 19.86, *et seq.*) (Count 18).

Plaintiffs seek actual, statutory, punitive and/or any other form of damages provided by the statutes cited; restitution, disgorgement and/or any other declaratory injunctive, or equitable relief provided by and pursuant to the statutes cited; an order "requiring GM to adequately disclose and remediate the Power Steering Assist defect and enjoining GM from incorporating the defective powertrain into its vehicles in the future; pre-judgment and post-judgment interest; and reasonable attorney fees and costs of the suit. (ECF No. 26, PageID.733-34).

In the present motion, GM seeks dismissal of all claims for failure to state a claim. Because this matter comes before the Court on a motion to dismiss the Amended Complaint, the following allegations in Plaintiff's Amended Complaint are taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**The Parties**

GM is an automaker headquartered in Michigan that designs, manufacturers, and sells automobiles throughout the United States under the brand names Chevrolet, GMC, and Cadillac. (ECF No. 26, PageID.621, ¶ 29).   Two of the automobiles it designs and manufactured are the Chevrolet Colorado and GMC Canyon.  (ECF No. 26, PageID.616, ¶ 2).

Plaintiffs are consumers who purchased MY 2015 and 2016 Colorados and Canyons manufactured in the United States before January 6, 2015 or after March 17, 2015 (the "Class Vehicles").  (ECF No. 26, PageID.641-668, ¶¶  65-157).  Plaintiffs leased or purchased their vehicles from "independent third part[y]" authorized dealers.  (ECF No. 33, PageID.1934).

4

**The Alleged Defect**

All of the Class Vehicles were protected by a limited bumper-to-bumper warranty "for 3 years or 36,000 miles, whichever comes first."  (ECF No. 30-2, PageID.1418; ECF No. 30-3, PageID.1468).  To be eligible for the warranty coverage, consumers were required to take their vehicles to a [GM] dealer facility within the warranty period and mileage limits to request needed repairs.  *Id.*

The Class Vehicles are equipped with a power steering system.  (ECF No. 26, PageID.616, ¶ 2).  Plaintiffs allege that the Class Vehicles contain a "defective electronic power steering assist torque sensor" (the "Alleged Defect").  (ECF No. 26, PageID.628, ¶ 47).  They say that a torque sensor "attached to the pinion shaft signals a control computer when to provide [steering] assistance."  (ECF No. 26, PageID.624–25, ¶ 39).  "The defect manifests with a significant and abrupt reduction of the power steering assist that makes turning of the steering wheel difficult." (ECF No. 26, PageID.616, ¶ 2).

Plaintiffs allege that GM knew of the Alleged Defect, and did not warn consumers, when the Class Vehicles were manufactured based on:

> GM's own knowledge about the material, design, and manufacture of the part, pre-production testing, preproduction design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair order and parts data received from the dealers, feedback, both directly and through its dealers, from its customers during repairs, complaints in the National Highway Transportation Safety Administration ("NHTSA") database, online complaints in web forums and social media that are monitored by GM, news reports, and prior recalls including those detailed above relating to electric power steering parts including the torque sensor.

(ECF No. 26, PageID.629, ¶ 48).

GM previously recalled MY 2015 Colorados and Canyons manufactured between January 6, 2015 and March 1, 2015.  (ECF No. 26, PageID.625, ¶ 40).  According to the February 2016

5

Recall Bulletin, "[t]hese vehicles may experience loss of power steering assist at startup, or while driving, due to a poor electrical connection within the torque-sensor harness connector. If power steering assist is lost or reduced, steering control can still be maintained, but would require an increased steering effort, particularly at lower speeds, which presents a greater risk of a crash." (the "Recall Defect") (ECF No. 26-3, PageID.748). To fix this issue, GM "replace[d] the steering gear torque sensor cover assembly." (*Id.*)  The parties dispute whether the Alleged Defect in Plaintiffs' vehicles and the Recall Defect are, in fact, the same problem. (*Compare*) (ECF No. 30, PageID.1371) (*with*) (ECF No. 26, PageID.627, ¶ 44).  Plaintiffs assert that the recalls "bear a striking resemblance to the steering defect in the class vehicles." (*Id.*).

Plaintiffs' further allege that GM had pre-sale knowledge of the claimed defect through customer complaints posted to two online forums, namely "www.coloradofans.com" and "www.carproblemzoo.com," and to the website of the National Highway Traffic Safety Administration ("NHTSA"). (ECF No. 26, PageID.629–30, ¶¶ 49–50). The "coloradofans.com" postings consist of a thread of comments related to "Power Steering Failure"; the first posting was published on May 27, 2015. (ECF No. 26-16). The "carproblemzoo.com" postings consist of a series of complaints regarding "Steering Problems of Chevrolet Colorado"; the posts all allege failure dates from 2020. (ECF No. 26-17). Plaintiffs provide 212 pages of complaints from NHTSA regarding steering problems with MY2015 and MY2016 Colorados and Canyons. (ECF No. 26-20). They quote 20 of these NHTSA complaints in the First Amended Complaint. (ECF No. 26, PageID.632–38). Plaintiffs allege that these complaints "are delivered to GM, reviewed by GM, and analyzed by GM's engineers. GM received and was aware of these consumer complaints." (*Id.* at ¶ 54). GM disputes that it was aware of these complaints.

**The Experiences of the Named Plaintiffs**

*Ambrose* is a New Jersey resident who purchased a new 2016 Colorado there on or about March 17, 2016. (ECF No. 26, PageID.641-3, ¶¶ 65-9). Ambrose estimates that he experienced the Alleged Defect between fifty and seventy times. (*Id*. at ¶ 67). Specifically, around July 2020:

> Ambrose was driving on the highway at about 55 MPH when he felt the steering wheel become heavy. Plaintiff likens the experience of trying to move the wheel to that of moving a cinderblock. While the vehicle was in motion, Plaintiff shifted the vehicle into Neutral and turned the ignition key off. Luckily for Plaintiff, there was little traffic around him. Upon turning the ignition key again, the defect was no longer present, at which point Plaintiff pulled off of the highway and into the parking lot.

(*Id*.). Ambrose took his vehicle in to the dealership for repairs on September 18, 2020.

*Barnes* is a Florida resident who purchased a new 2016 Colorado there in August of 2015. Barnes began experiencing the Alleged Defect around late spring or early summer 2018 when the vehicle had about 40,000 miles on it. (ECF No. 26, PageID.643-4, ¶¶ 70-5). Specifically, "[w]hen driving, he would suddenly lose power steering and see a flashing light that there was no stabilitrak." (*Id*. ¶ 72). For instance,

> Barnes was driving in the roundabout at the Tampa International Airport when he suddenly lost power steering, which made it difficult to maneuver in traffic, especially with other vehicles  traveling at varying speeds and stopping to pick up passengers. Another time in the summer of 2018, his wife was driving in the parking lot of a Publix grocery store in Saint Petersburg when the vehicle abruptly lost power steering. His wife struggled to turn the wheel and refused to drive the vehicle after this incident.

(*Id*.). Barnes experienced the defect many additional times. (*Id*. ¶ 73). After researching the matter, Barnes "discovered there was a recall but that it only pertained to certain model year 2015 vehicles" and "he also knew that his mileage at the time was beyond the limits of warranty" so "any appeal to GM or his local dealership would be futile."  (*Id*.). Therefore, Barnes ordered the necessary parts and replaced the power steering himself. (*Id*. ¶ 74).

*Chapman* is a Washington resident who leased a new 2015 Canyon there in April of 2015, and in June 2018 he exercised the purchase option, paying cash to buy the vehicle at the residual price. (ECF No. 26, PageID.645-7, ¶¶ 76-84). Chapman began experiencing the Alleged Defect in September or October of 2019. (*Id*. ¶ 78). At the time, his vehicle had about 20,000 miles on it. (*Id*.). Specifically,

> [W]hile he was traveling about 55 mph on State Highway 307, near Poulsbo, Washington. As he suddenly lost power steering, he heard a chime, and then saw two alternating dashboard warnings flashing notifications that his power steering and stabilitrack needed servicing. Plaintiff Chapman thankfully managed to navigate the vehicle to safety by exerting significant torque on the steering wheel to change lanes on the highway and take the exit. Once stopped at a safe location, Plaintiff Chapman turned the engine off, waited a few minutes, and then restarted the engine, which appeared to remedy the issue.

(*Id*.). Chapman experienced the defect about two additional times, so then he first took his vehicle to the dealership for repairs after "September or October of 2019." (*Id*. ¶ 78-9). Despite this, Chapman continued to experience the defect.

*Cirignano* is a South Carolina resident who purchased a new 2016 Colorado there in August of 2016. (ECF No. 26, PageID.648-9, ¶¶ 85-9). Cirignano experienced the Alleged Defect multiple times. (*Id*. ¶ 87). During one of the instances in 2019,

> Plaintiff Cirignano's vehicle was driving on the highway at about 45-50 MPH when he felt the steering wheel become heavy and difficult to steer. While the vehicle was in motion, Plaintiff Cirignano stopped the vehicle in a middle turn lane on the road, at which point Plaintiff Cirignano turned the Class Vehicle off and back on. After Plaintiff Cirignano started the Class Vehicle again, the defect was no longer present and Plaintiff Cirgnano was about to continue driving.

(*Id*.). He took his vehicle to the dealership for repairs on some date in 2019 after exceeding at least 35,000 miles. (*Id*.)

*Faussett* is a California resident who purchased a new 2016 Colorado there on or about September 2, 2016. (ECF No. 26, PageID.649-51, ¶¶ 90-7). Faussett began experiencing the

Alleged Defect in late fall 2019. (*Id*. ¶ 92). Faussett experienced the Alleged Defect frequently, and during one incident around late January or early February 2020,

> Faussett was driving the vehicle north on Foothill Boulevard in Los Angeles at about 25 to 30 miles per hour, and preparing to take the gradual right curve to merge onto Sierra Highway. About halfway through the curve, the power steering suddenly went out without warning. As a result, the vehicle went into the lane to the left of him, which had vehicles moving in the same direction.

(*Id*. ¶ 93). Faussett took his vehicle to the dealership for repairs on March 3, 2020 after exceeding 55,000 miles. (*Id*. ¶ 95).

*Grujic* is an Illinois resident who purchased a new 2015 Colorado there on or about December 5, 2014. (ECF No. 26, PageID.652-3, ¶¶ 98-102). Grujic experienced the Alleged Defect "scores of times, beginning in March 2020." (*Id*. ¶ 100). By mid-September 2020, "the defect started to manifest daily," and he took his vehicle to the dealership for repairs. (*Id*.).

*Keller* is a South Carolina resident who purchased a new 2015 Canyon in North Carolina on or about September 28, 2016. (ECF No. 26, PageID.653-5, ¶¶ 103-7). Keller estimates that he experienced the Alleged Defect between 20 and 25 times. (*Id*. ¶ 105). During one incident,

> Plaintiff Keller was driving on a winding two-lane road at about 45 MPH when he felt the steering wheel stiffen and become heavy. When the defect occurred, Plaintiff Keller saw traffic in front of and behind his vehicle. Plaintiff Keller was able to steer the vehicle into a nearby gas station and park. Plaintiff Keller turned the vehicle off and back on four or five times before the defect was no longer present, at which time Plaintiff Keller was able to drive again.

(*Id*.). Keller took his vehicle to the dealership for repairs in April of 2020 after exceeding 65,000 miles. (*Id*. ¶ 106).

*Kobel* is a New York resident who purchased a new 2015 Colorado there in February 2015. (ECF No. 26, PageID.655-7, ¶¶ 108-14). Kobel began to experience the Alleged Defect on or around August 8, 2020. (*Id*. ¶ 110).

> The first incident happened while he was traveling at highway speeds, getting onto the Southern State Parkway from the Watangh Parkway. As he was coming around the curve, he suddenly lost power steering in his Colorado. He was thankfully able to navigate off the Southern State Highway and to his home, a few blocks away. After stopping and then starting the vehicle up again, the power steering appeared to be restored.

(*Id.*). Kobel took his vehicle to the dealership for repairs after August 8, 2020 after exceeding 91,105 miles.

*Lawson* is an Indiana resident who purchased a new 2016 Canyon there on or about September 22, 2015. (ECF No. 26, PageID.657-8, ¶¶ 115-20). Lawson began to experience the Alleged Defect in the Summer of 2019. (*Id.* ¶ 117). Specifically,

> Following a trip to his local auto parts store, Plaintiff Lawson lost power steering in the parking lot as he shifted the vehicle into drive. Finding nothing wrong under the hood, he turned the vehicle off and on, which appeared to rectify the issue. Plaintiff drove his vehicle to the dealership to inform them of the issue and was told they had no knowledge of this problem. Around six months later, Plaintiff[] lost power steering again while on the road. Luckily, there was no traffic around, allowing him to safely pull over and perform the same remedy as before: turning the vehicle off and on.

(*Id.* ¶ 118). Lawson experienced the Alleged Defect two more times, and he took his vehicle to the dealership after exceeding 69,000 miles. (*Id.*). "A mere one and a half miles later, Plaintiff Lawson's power steering went out again" and he returned to the dealership. (*Id.* ¶ 119).

*Lutsk* is a California resident who purchased a 2015 Colorado there on or about November 28, 2014. (ECF No. 26, PageID.665-7, ¶¶ 144-151). Lutsk first experienced the Alleged Defect in 2019, and over the next several months the defect "started to happen every day, and Plaintiff Lutsk nearly got into multiple accidents[.]" (*Id.* ¶ 147). He took his vehicle to the dealership for repairs in January of 2020 after exceeding 47,000 miles. (*Id.*)

*Magallanes* is a California resident who purchased a 2016 Colorado there in August 2016. (ECF No. 26, PageID.659-60, ¶¶ 121-25). Magallones began to experience the Alleged Defect on or about September 12, 2019. (*Id*. ¶ 123). Specifically,

> While on her way to visit her husband at the hospital, Plaintiff Magallanes' power steering went out as she prepared to exit the freeway. The steering column locked up and Plaintiff had difficulty turning the wheel. She turned off the freeway as quickly as she could and exited the vehicle upon finding a safe place to park. She did not want to drive the vehicle any further.

(*Id*.). Magallanes called AAA and was told she would need to have the vehicle towed. (*Id*. ¶ 124). After this incident, she took her vehicle into the dealership for repairs on that same day, after exceeding 53,779 miles. (*Id*.).

*Meir* is a Connecticut resident who purchased a 2015 Colorado there in January of 2015. (ECF No. 26, PageID.660-1, ¶¶ 126-30). Meir estimates that he experienced the Alleged Defect at least thirty times. (*Id*. ¶ 128). Specifically,

> When the defect manifested, the vehicle's dashboard lights would suddenly light up and the vehicle would abruptly lose power steering. When the loss of power steering would occur, Plaintiff Meir would pull over, turn the vehicle off and then back on. This would typically remedy the problem until the next time he lost power steering.

(*Id*.). Meir first contacted GM about repairs after exceeding 80,000 miles. (*Id*.)

*Ostrander* is a North Carolina resident who purchased a new 2016 Canyon in California in February 2016. (ECF No. 26, PageID.661-3, ¶¶ 131-7). Ostrander experienced the Alleged Defect beginning in January 2017 after exceeding 35,000 miles. (*Id*. ¶ 133). He estimated that he experienced the Alleged Defect hundreds of times, and it eventually became a daily event (*Id*.). Ostrander then took his vehicle to the dealership for repairs in June of 2017, December 2017, and April or May 2020. (*Id*.)

*Overturf* is a South Dakota resident who purchased a new 2015 Colorado there in March of 2015. (ECF No. 26, PageID.664-5, ¶¶ 138-43). Overturf experienced the Alleged Defect twice. (*Id.* ¶ 140). The first occurrence happened on or about August 6, 2020, and during both occurrences Overturf was driving on a state highway when he lost control of the vehicle and the dashboard light came on. (*Id.*). He took his vehicle to the dealership for repairs after August 6, 2020 after exceeding 80,150 miles. (*Id.* ¶ 141).

*Woronko* is a Michigan resident who purchased a new 2016 Colorado there on or about June 9, 2016. (ECF No. 26, PageID.667-8, ¶¶ 152-157). Woronko experienced the Alleged Defect in or around July 2019 when he "attempted to back his vehicle out of his driveway when the steering failed to work and the dashboard light came on." (*Id.* ¶ 154). Woronko had the vehicle towed to the dealership for repairs after exceeding 56,000 miles. (*Id.* ¶ 156).

## STANDARD OF REVIEW

A motion to dismiss tests the legal sufficiency of the plaintiff's complaint. To survive a motion to dismiss, the complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

Although the Court must accept all well-pleaded factual allegations as true for purposes of a motion to dismiss, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Thus, to avoid dismissal, "a complaint must contain sufficient factual matter," accepted as true, to state a claim for relief that is plausible on its face.

*Id.* at 678. In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "The fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to give adequate notice to the parties of each side's claims and to allow cases to be decided on the merits after an adequate development of the facts." *Id*.

"When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

## ANALYSIS

### I. Claims for the Nationwide Class (Counts 1, 2, 3, 6, and 7)

As an initial matter, GM argues that the claims brought on behalf of the Nationwide Class should be dismissed because the Plaintiffs do not allege injuries in states other than where they reside and purchased their vehicles and they do not plead claims under the laws of all fifty states. (ECF No. 30, PageID. 1404-1405).

"[C]lass-certification analysis may precede standing analysis when the class certification issue [is] logically antecedent to the standing issue." *McKee v. Gen. Motors LLC*, 376 F. Supp.3d 751, 755 (E.D. Mich. 2019) (citations removed). "This 'logically antecedent' language should be

construed in a manner that permits consideration of the standing issue prior to class certification." *Flores v. FCA US LLC*, 2021 WL 1122216, at **25-26 (E.D. Mich. 2021). As this Court explained in *Flores*, "[n]amed plaintiffs 'who represent a class must allege and show that they personally have been injured not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Id.*, (quoting *In re Packaged Ice Antitrust Litig.*, 779 F.Supp.2d 642, 657 (E.D. Mich. 2011)).

Plaintiffs seek to represent a nationwide class but only present factual allegations on behalf of named Plaintiffs in only twelve states. (ECF No. 26, PageID. 641-668). The named Plaintiffs here do not allege injuries in states other than their own or base their claims on the application of other states' laws. (*Id.*); *see Wozniak v. Ford Motor Company*, 2019 WL 108845, at *1, No. 2:17-cv-12794 (E.D. Mich. Jan. 4, 2019) (determining that the named plaintiffs failed to allege injury in twenty-three states and dismissing the claims for lack of standing); *Pistorio v. FCA US LLC*, 2022 WL 141524, at *6 (E.D. Mich. Jan. 14, 2022) (determining that the named plaintiffs failed to allege injury in forty-three states and dismissing the nationwide claims for lack of standing).

Plaintiffs therefore lack standing to bring claims on behalf of a nationwide class, and the Court GRANTS GM's motion as to the claims brought on behalf of the nationwide class and DISMISSES Count 1.

Unlike Count 1, which is only brought on behalf of a nationwide class, Plaintiffs bring Counts 2, 3, 6, and 7 "On Behalf of the Nationwide class and the State Subclasses." (ECF No. 26, PageID 678-689). The Court shall therefore address Counts 2, 3, 6, and 7 only as to the state sub-classes represented by the named plaintiffs.

**II. Warranty Claims (Counts 2, 3, 4, and 5)**

In Counts 2-5 of the First Amended Complaint, Plaintiffs bring state law claims for breach of express and implied warranties for each of the state sub-classes.

**A. Express Warranty (Counts 2 and 4)**

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992). To maintain a claim for breach of an express or implied warranty, a plaintiff must, among other things, "seek warranty service within the [] period contained in the . . . [w]arranty." *In re General Motors Air Conditioning Marketing and Sales Practices Litig.*, 406 F. Supp. 3d 618, 628 (E.D. Mich. 2019) (internal citation omitted).

Here, Plaintiffs assert that GM "breached its [express] warranties by offering for sale and selling defective vehicles." (ECF No. 26, PageID.679, ¶ 189.).

GM acknowledges that Plaintiffs were provided with a written, express warranty. (ECF No. 30, PageID. 1374). GM's Limited Warranty provides that it will "cover[] repairs to correct any vehicle defect . . . due to materials or workmanship occurring during the warranty period." (ECF No. 30-2, PageID.1418; ECF No. 30-3, PageID.1468). The Bumper-to-Bumper warranty component[1] covers defects to the power steering system. (*Id.*). Under this warranty, the coverage period is three years or 36,000 miles, whichever comes first. (*Id.*). To obtain repairs under the warranty, the owner must "take the vehicle to a dealer facility within the warranty period and request the needed repairs." (*Id.*).

---

[1] There is also a Powertrain Component Warranty in effect for the first 5 years or 60,000, whichever comes first. The alleged defect in this case does not fall under the Powertrain Component Warranty.

GM argues that Plaintiffs' express warranty claims must be dismissed because none of the plaintiffs experienced the Alleged Defect or presented their vehicle to GM for repairs during the warranty period.  (ECF No. 30, PageID.1375, 1376).  GM also argues that the terms of their warranty are not unconscionable.  (*Id.*).

Plaintiffs do not argue that they experienced the Alleged Defect or presented their vehicles to a certified GM dealership for the defect during the period of the Bumper-to-Bumper warranty. And from the Court's review of the Plaintiffs' allegations of their individual experiences, GM is correct.[2]  (*See* ECF No. 26, PageID.641–668).  As a result, if the warranty limits are enforceable, it is not plausible that GM breached the express warranty.  *See, e.g.*, *Roe v. Ford Motor Co.*, *(Roe I)*, No. 18-12528, 2019 WL 3564589, at *9 (E.D. Mich. Aug. 6, 2019) ("As it is not plausible that any plaintiff brought his or her vehicle to a Ford dealer for a water-pump repair within the lesser of five years and 60,000 miles, Ford's express-warranty obligation to repair or replace the water pump was never triggered."); *In re General Motors*, 406 F. Supp. at 628 (dismissing the plaintiffs' express warranty claims because no plaintiff "allege[d] that his or her air conditioning system failed and/or that he or she sought warranty coverage related to the air conditioning system during the durational limits covering the express and implied warranties").

Plaintiffs argue that the time and mileage limitations in GM's limited warranty, however, do not bar their claims because they are unconscionable and unenforceable.  (ECF No. 32, PageID.1560–62).  Plaintiffs argue that where "a manufacturer is aware that its product is inherently defective, but the buyer has no notice of [or] ability to detect the problem, there is

---

[2] Plaintiffs allege that one plaintiff, Eric Ostrander, took his vehicle to the dealership for repairs within 18 months of purchase, however Plaintiffs do not provide information about his mileage to sufficiently establish that he was within the warranty period.  (ECF No. 26, PageID.662, ¶ 133).

perforce a substantial disparity in the parties' relative bargaining power . . . thereby rendering such [warranty] limitations unconscionable and ineffective," quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989). (*Id.* at PageID.1560). According to them, "GM knew about the latent defect in the electronic power steering toque assist sensor at various points," and "the defect was not known to or reasonably discoverable by the Plaintiffs prior to purchase or lease and without experiencing the defect first-hand and exposing themselves to an unreasonable safety risk." (*Id.* at PageID.1560–61).

To successfully plead a breach of warranty claim based on the theory of unconscionability, a plaintiff must allege both substantive and procedural unconscionability. *Rivera v. Ford Motor Co.*, 2017 WL 3485815, at *3 (E.D. Mich. Aug. 15, 2017). The Sixth Circuit has held that a contact is substantively unconscionable where its provisions are so "outrageously unfair as to shock the judicial conscious, and it has also held that a contact is procedurally unconscionable where the relative bargaining power and alternative sources of supply strongly favors one party. *See Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 322 (6th Cir. 1998) (applying Michigan law). ("[U]nconscionability is a question of law for the court to decide.")

The Plaintiffs argue both, stating that where "a manufacturer is aware that its product is inherently defective but the buyer has no notice of [or] ability to detect the problem, there is perforce a substantial disparity in the parties' relative bargaining power . . . thereby rendering such [warranty] limitations unconscionable and ineffective," quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989). (*Id.* at PageID.1560). According to Plaintiffs, "GM knew about the latent defect in the electronic power steering toque assist sensor at various points," and "the defect was not known to or reasonably discoverable by the Plaintiffs prior to purchase or lease and without experiencing the defect first-hand and exposing themselves to an unreasonable safety

17

risk." (*Id.* at PageID.1560–61).  GM denies such knowledge and also argues that the terms of their warranty are not unconscionable.  (*Id.* at PageID.1375–76).

The Plaintiffs have not demonstrated substantive or procedural unconscionability, as the warranty terms are not unusual and the buyers had ample options to negotiate with other automobile dealers.   Plaintiffs cite a number of cases in support of their unconscionability argument, all of which are arguably rooted in *Carlson*.   Accordingly, the Court will address *Carlson* and determine its applicability here.

In *Carlson*, like here, the plaintiffs alleged that GM was aware of defects in its vehicles and argued that GM's durational limits in its warranty were unconscionable.  *Carlson* reasoned that "[w]hen a manufacturer is aware that its product is inherently defective, but the buyer has no notice of [or] ability to detect the problem, there is perforce a substantial disparity in the parties' relative bargaining power . . . thereby rendering such [warranty] limitations unconscionable and ineffective."  883 F.2d at 296.   Accordingly, the court believed that "the presumption is that the buyer's acceptance of limitations on his contractual remedies—including of course any warranty disclaimers—was neither 'knowing' nor 'voluntary,' thereby rendering such limitations unconscionable and ineffective."  *Id.*   Notably, *Carlson* is not binding on this court and is distinguishable here, as Plaintiffs have not plausibly alleged that GM had pre-sale knowledge of a defect, as discussed below. Therefore, even if *Carlson* were applicable, Plaintiffs could not rely solely on pre-sale knowledge of a defect to establish unconscionability.  *See also Hall v. General Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *12 ("Because Plaintiffs have not plausibly alleged GM's knowledge of the StabiliTrak Defect, Plaintiffs cannot establish that the durational limits in the implied warranties are unconscionable based on that supposed knowledge.")

As to procedural unconscionability, and as observed in *Roe II*, 2021 WL 2529825, at *15–16, bargaining power is dictated by more than just knowledge and also includes the buyers alternative purchasing options.  In *Roe II*, the court reasoned that even though plaintiffs did not have the power to "haggle…for warranty terms that were tailored to their particular needs" the parties there had opportunities to opt for different warranties or purchase automobiles from one of a number of other dealers.  *Id.* at 16.  This Court finds the reasoning of *Roe II* persuasive.

First, the court in *Carlson* cautioned that "unconscionability claims should but rarely be determined on the bare-bones pleadings—that is, with no opportunity for the parties to present relevant evidence of the circumstances surrounding the original consummation of their contractual relationship."  883 F.2d at 292.  Given the multi-factored analysis required in order to determine unconscionability, the court believed that "*bona fide* questions of unconscionability" could not be resolved "before the litigants have had an opportunity present such evidence."  *Id.* at 293.  The danger, the court noted, was that courts "might dispose of viable claims prematurely."  *Id.*  But as *Roe II* and other courts have pointed out, that "discovery first" approach seems inconsistent with *Iqbal*'s requirement that a plaintiff must allege sufficient facts to show that his claim is plausible, and not merely possible, before the case may proceed to discovery.  *Roe II*, 2021 WL 2529825, at *15; *Alban v. BMW of N. Am.*, No. 09-5398, 2011 WL 900114, at *9 n.8 (D.N.J. Mar. 15, 2011) ("[I]n light of *Bell Atlantic* and *Iqbal,* the Fourth Circuit's logic is no longer persuasive, as conclusory allegations are insufficient to survive a motion to dismiss."); *Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327, 2015 WL 5686507, at *7 n.5 (E.D.N.Y. Sept. 25, 2015) ("*Carlson*, however, is not binding in this circuit, and has been criticized by several district courts in light of the Supreme Court's subsequent decision in *Iqbal* and *Twombly*.").

Second, "while *Carlson* rightly found that information asymmetry affects bargaining power, bargaining power is dictated by more than just knowledge." *Roe II*, 2021 WL 2529825, at *16. The Fourth Circuit itself, albeit in an unpublished decision, underscored that *Carlson* should not be read "for the broad proposition that the *terms* of a warranty are necessarily substantively unconscionable solely because one party conceals certain information during the bargaining process" and that "cases finding substantive unconscionability based on an inherent defect in a warranted product require some link between the defect and the objective unfairness of the warranty terms." *Hart v. Louisiana-Pacific Corp.*, 641 F. App'x 222, 228–29 (4th Cir. 2016). In particular, "[a]side from knowledge, bargaining power depends on options." *Roe II*, at *16; *See also In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 630 (E.D. Mich. 2019) ("[A] seller's presale knowledge of an alleged defect, standing alone, is insufficient to establish procedural unconscionability.").

Here, as GM points out, Plaintiffs had may options given the competitiveness of the car market. Courts have recognized that "the auto industry is one of the most competitive marketplaces that exists." *Air Conditioning Mktg.*, 406 F.Supp.3d at 629. "An individual seeking to purchase [the vehicle in question] has many other options – sometimes within walking distance of his local GM dealership – if he is unhappy with the warranty that GM provides." *Id.* Thus, "'the clear weight of authority' has rejected the argument that a vehicle 'warranty [is] procedurally unconscionable because [consumers] had no meaningful choice in determining the time limits [of the warranty].'" *Id.* (quoting *Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626, at *20 (D.N.J. Oct. 9, 2013) (dismissing breach of express warranty claim and rejecting argument that warranty was procedurally unconscionable); *See also Rivera*, 2017 WL 3485815, at *4 ("The case law is clear . . . [that] a defendant's knowledge of a latent defect does not render

unconscionable a limitation contained in an express warranty.") (citing *Chiarelli v. Nissan N. Am., Inc.*, 2015 WL 5686507, at *7 (E.D.N.Y. Sept. 25, 2015); *Smith v. Ford Motor Co.*, 462 F. App'x 660, 663–64 (9th Cir. 2011) (finding warranty limits not unconscionable and explaining "Smith was presented with a meaningful choice, not just the option of purchasing a different vehicle from a different manufacturer, but also the option of purchasing a different warranty with an extended durational limit from Ford.").

Third, the Court finds the reasoning from the Second Circuit in *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 249–50 (2d Cir. 1986), to be more persuasive. There, the Second Circuit rejected the plaintiff's argument that "a defect discovered outside the time or mileage limits of the applicable written warranty, but latent before that time, may be the basis of a valid express warranty claim if the warrantor knew of the defect at the time of sale." The court reasoned that:

> virtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a "latent defect" that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to "know" that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Id.* There are no facts here to suggest that the terms of the warranty were determined by anything other than the business judgment described in *Abraham*. In sum, the Court does not find *Carlson* persuasive; accordingly, the Court agrees with the *Abraham* and many other courts that Plaintiffs must allege more than mere knowledge of a defect to plausibly allege unconscionability.

21

Finally, Plaintiffs have provided supplemental briefing (ECF Nos. 36, 38) on this matter. The Plaintiffs cite *Bossart v. General Motors LLC*, No. 2:20-cv-11057-BAF-DRG, 2021 WL 5278191 (E.D. Mich, May 15, 2021) (J. Friedman) to argue that it would be premature to dismiss the warranty claims at this stage of the proceeding. However, *Bossart* is distinguishable from this case because at least four of the plaintiffs in *Bossart* brought their class vehicles for repairs during the warranty period. *Id.* at *6. Here, none of the plaintiffs brought their class vehicles for repairs during the Bumper-to-Bumper warranty period. Further, the plaintiffs in *Bossart* alleged pre-sale knowledge of an alleged defect with the requisite specific to require findings of fact by a jury. *Id.* However, as the Court notes below, the plaintiffs here do not allege with sufficient particularity that GM had pre-sale knowledge of the alleged defect at issue.

For the foregoing reasons, Plaintiffs' breach of express warranty claims fail. Consequently, the class's claim also falls. *See J & R Mktg., SEP v. Gen. Motors Corp.,* 549 F.3d 384, 390 (6th Cir. 2008) (finding that if, prior to class certification the named plaintiffs' individual claims fail, then dismissal is proper). Therefore, the Court GRANTS GM's motion as to the express warranty claims and DISMISSES Counts 2 and 4.

## B. Implied Warranty (Counts 3 and 5)

The Amended Complaint alleges that GM "breached the implied warranty of merchantability in the sale or lease of the Class Vehicles to Plaintiffs and members of the state subclasses in that the vehicles were not fit for their ordinary purpose and not merchantable." (ECF No. 26, PageID.680, ¶ 194).

However, where an express warranty is deemed conscionable and valid, an implied warranty can be limited to the duration of the express warranty. *See Hall*, 2020 WL 2740240. A seller/warrantor may limit the duration of an implied warranty "to the duration of a written

warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty." 15 U.S.C. § 2308(b). In *Hall,* the court limited the duration of the implied warranty to the express warranty, finding no pre-sale knowledge or any unconscionability. 2020 WL 1285636, at *11. And in *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *9 (E.D. Mich. June 7, 2018), the court did the same.

Here, GM's Limited Warranty expressly limits "any implied warranty of merchantability or fitness for a particular purpose . . . to the duration of this [Limited Warranty]." (ECF No. 30-2, PageID. 1427). Accordingly, Plaintiffs do not state a valid claim for breach of implied warranty because none of them met the warranty requirements for both timing and mileage. Because Plaintiffs' claims fail, the class's claim also falls. *See J & R Mktg., SEP v. Gen. Motors Corp.,* 549 F.3d 384, 390 (6th Cir. 2008) (finding that if, prior to class certification the named plaintiffs' individual claims fail, then dismissal is proper); *see Lewis v. Casey,* 518 U.S. 343, 357 (1996).

Therefore, the Court GRANTS GM's motion as to the implied warranty claims and DISMISSES Counts 3 and 5.

## II. Unjust Enrichment Claim (Count 7)

In Count 7 of the Amended Complaint, Plaintiffs allege that GM has been unjustly enriched in retaining the "profits, benefits, and other compensation obtained through its wrongful conduct in manufacturing, marketing and selling the Vehicles with defective electronic power steering torque assist sensor to Plaintiffs and the Classes." (ECF No. 26, PageID.689-90, ¶¶ 235-9).

When an express warranty covers the matter at issue, an unjust enrichment claim is not cognizable. *See Matanky*, 370 F.Supp. 3d at 803.

"Alternatively pleading an express contract and implied contract (whether styled as unjust enrichment or *quantum meruit*) is allowed when, for instance, there is a dispute between the parties

as to whether an express agreement exists." *Llwellyn-Jones v. Metro Property Group, LLC*, 22 F. Supp. 3d 760, 793 (E.D. Mich. 2014) (citing *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426-27 (1976)). "A party is not required to elect to proceed under one theory or the other, but could seek recovery on the basis either of an express contract, or an implied contract if the trier of fact found that the express contract did not exist." *Id*. Additionally, "the plaintiff also may bring a breach of contract claim and an unjust enrichment claim in cases where the defendant has 'kept its options open, and may deny the existence of the contract.'" *Id*. (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 182 (6th Cir. 1996)).

Here, this is not the case. The parties agree that there is an express warranty that governs the dispute: GM's Limited Warranty. (*See* ECF Nos. 26, 30). Therefore, Plaintiff's unjust enrichment claim must be dismissed. "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for *quantum meruit* or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract." *Advanced Plastics Corp. v. White Consol. Indus., Inc.,* 828 F. Supp. 484, 491 (E.D.Mich.1993) (citations omitted). Plaintiffs "can hardly claim that the express warranty does not govern this issue, when [they] explicitly allege[] in the amended complaint that [GM's] representations regarding the quality of the class vehicles constituted a breach of express warranty." *Rivera v. Ford Motor Company*, Case No. 16-cv-13786, 2017 WL 3485815, at *7 (E.D. Mich. Aug. 15, 2017). "Many recent cases in this District confirm that unjust enrichment claims should be dismissed against auto manufacturers when a valid express warranty exists." *Gant*, 517 F.Supp.3d at 723 (citing *McKee*, 376 F.Supp.3d at 762; *Hall*, 2020 WL 1285636, at *9; *Miller v. Gen. Motors LLC*, No. 17-14032, 2018 WL 2740240, at *15 (E.D. Mich. June 7, 2018), *appeal*

24

*dismissed per stipulation*, No. 20-1321, 2020 WL 6140402 (6th Cir. Sept. 28, 2020)); *Pistorio*,
2022 WL 141524, at *13-14.

Therefore, the Court GRANTS GM's motion as to Plaintiffs' unjust enrichment claim
and DISMISSES Count 7.

### IV. Fraud Claims (Counts 6, 8-18)

In the Amended Complaint, Plaintiffs bring a claim of fraudulent concealment (Count 6)
as well as claims under various state consumer protection laws (Counts 8–18).

GM argues that each of these claims should be dismissed because they sound in fraud and
Plaintiffs fail to comply with Federal Rule of Civil Procedure 9(b) and 12(b)(6) pleading
requirements for fraud. (ECF No. 30, PageID. 1388-1398).

As an initial matter, the Court finds that Plaintiffs' fraudulent concealment claim and state
law claims sound in fraud. (*See* ECF No. 26, PageID. 687-734). *See Smith v. Gen. Motors LLC*,
988 F.3d 873 (6th Cir. 2021) (applying Rule 9(b) to state-law consumer protection claims).

### A. Misrepresentation Claims

Rule 9(b) requires a party plead "with particularity the circumstances constituting fraud or
mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged
generally." FED. R. CIV. P. 9(b). The Sixth Circuit reads Rule 9(b) liberally, requiring a plaintiff,
at a minimum, to "allege the time, place, and content of the alleged misrepresentation on which he
or she relied; the fraudulent scheme; the fraudulent intent; and the injury resulting from the
fraud." *See Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir. 1993).

Here, Plaintiffs do not argue that they have made sufficient allegations for a fraudulent
misrepresentation claim. (ECF No. 32, PageID. 1543-1552). Instead, Plaintiffs argue that they
have met the standard for a fraudulent omission claim. (*Id.*).

**B. Omission-Based Claims**

"The specificity required for allegations of affirmative misrepresentations is necessarily different than the specificity required for allegations of fraudulent omissions." *Gamboa v. Ford Motor Co.*, 381 F.Supp.3d 853, 872-873 (E.D. Mich. 2019) (citing *In re Duramax Diesel Litig.*, 298 F.Supp.3d 1037, 1055 (E.D. Mich. 2018)). "When it comes to claims of fraud by omission or fraudulent concealment, the plaintiff faces a slightly more relaxed pleading burden; the claim can succeed without the same level of specificity required by a normal fraud claim." *Beck v. FCA US LLC*, 273 F.Supp.3d 735,751 (E.D. Mich. 2017). However, even for a fraudulent omission claim, "Rule 9(b) requires a plaintiff to set forth the 'who, what, when, where, and how' of the alleged omission." *Gamboa*, 381 F.Supp.3d at 873 (citing *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012)); see also *McKee v. General Motors, LLC*, 376 F.Supp.3d 751, 760-61 (E.D. Mich. 2019).

To survive a motion to dismiss on a fraudulent omission claim, "Plaintiffs must set forth: (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what defendant obtained as a consequence of the alleged fraud." *Id*. "A complaint may suffice under the applicable standard if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Wozniak*, 2019 WL 108845 at *3.

Here, Plaintiffs allege that GM "intentionally and knowingly concealed, suppressed and/or omitted material facts including the presence of the defective electronic power steering torque assist sensor."  (ECF No. 26, PageID.687).  Further, Plaintiffs allege that that GM knew that the

vehicles contained the defect, GM concealed the defect, and that GM never intended to repair or replace the defect during the relevant warranty periods. (*Id.*). According to Plaintiffs, GM knew its concealment and suppression of material facts was misleading, and would enable GM to "sell more Class Vehicles[.]" (*Id.* at PageID.688-689). Plaintiffs make similar allegations as to their state law consumer protection claims, including that GM engaged in unfair and/or deceptive practices because it intentionally or negligently concealed and suppressed material facts regarding the defect. (ECF No. 26, PageID.691).

GM broadly argues that Plaintiffs' allegations do not satisfy Rule 9(b)'s particularity requirement. It complains that their allegations "do not identify any specific and material facts that GM concealed or omitted from them, when or where GM allegedly concealed or omitted those facts and by whom, how Plaintiffs were misled, or why the omissions were fraudulent." (ECF No. 30, PageID.1389). GM also argues that Plaintiffs fail to allege GM's pre-sale knowledge of the defect (*id.* at PageID.1390), fail to allege "details about any information that any named Plaintiff reviewed before buying a vehicle, let alone what misrepresentations or omissions each specific Plaintiff actually read or saw" (ECF No. 30, PageID.1391), and fail to answer "[w]hat 'advertisements, offers, or other representations' did each individual named Plaintiff rely on to make their purchases, such that they would have been aware of a disclosure had one been made" (ECF No. 30, PageID.1392).

Plaintiffs respond that they have satisfied Rule 9(b). Plaintiffs point out that they have alleged that beginning in 2015, GM knew about the defect, and failed to disclose it in its marketing materials and press kits. (ECF No. 32, PageID.1544). Further, Plaintiffs say that if they had known about the purported defect, they would have paid less for or would not have bought or leased these

vehicles.  (*Id.*).  Thus, according to Plaintiffs, they have pled with particularity the "who," "what," "when," where," and "how" of GM's fraudulent omission.

### i. Pre-Sale Knowledge

The question here is whether Plaintiffs have met the standard for pleading the "what," or in other words, whether Plaintiffs have alleged GM's pre-sale knowledge of the purported defect with sufficient particularity under Rule 9(b). In *Smith*, the Sixth Circuit explained that:

> [A] complaint must contain specific facts showing the manufacturer's knowledge of the defect that it allegedly fraudulently concealed. Mere assertions that a manufacturer's routine testing, along with customer feedback and increased warranty claims, should have alerted it to a dangerous defect are not enough to meet the 12(b)(6) pleading standard.

988 F.3d at 886.

Plaintiffs attempt to establish that GM had pre-sale knowledge of the claimed defect through three sources: (a) customer complaints to online forums and NHTSA's website; (b) pre-sale testing and validation; and (c) the recall of certain MY2015 Colorados and Canyons. Individually and collectively, however, these allegations are pleaded at too high a level of generality to support a reasonable inference that GM had pre-sale knowledge of the alleged steering defect.

### a. Customer Complaints

Plaintiffs say that GM possessed pre-sale knowledge of the defect through customer complaints posted to two online forums, namely "www.coloradofans.com" and "www.carproblemzoo.com," and to NHTSA's website.  (ECF No. 26, PageID.629–30).  In support of this proposition, Plaintiffs attach complaints and comments from a forum on coloradofans.com entitled, "Power Steering Failure" (ECF No. 26-16), and several pages of privately reported steering problems with Chevrolet Colorados from a forum on carproblemzoo.com entitled,

"Steering Problems of Chevrolet Colorado" (ECF No. 26-17).  According to Plaintiffs, these websites "are monitored by GM."  (ECF No. 26, PageID.629).  Plaintiffs also attach 212 pages of complaints filed with the NHTSA regarding steering problems with 2015 and 2016 Chevrolet Colorado and Canyon vehicles.  (ECF No. 26-20).  They point to a sampling of these (ECF No. 26, PageID.632–38), and allege that "[t]hese consumer complaints filed with the NHTSA are delivered to GM, reviewed by GM, and analyzed by GM's engineers" and that "GM received and was aware of these consumer complaints" (*id.* at PageID.631, ¶ 54).  But, contrary to Plaintiffs' allegations, these complaints do not sufficiently demonstrate a connection to the defect at issue, and thus do not establish that GM had pre-sale knowledge of this defect.

First, this District has previously held that pre-sale knowledge is not established where most complaints post-date the purchase of the automobiles.  *See, e.g.*, *Johnson v. FCA US LLC*, No. 20-cv-12690, 2021 WL 3633595, at *15 (E.D. Mich. Aug. 17, 2021); *McKee*, 376 F. Supp. 3d at 761-2.  That is the case here: most of the consumer complaints Plaintiffs have provided post-date the Plaintiffs' purchases, with the latest purchase date being September 28, 2016.  For example, all of the postings from carproblemzoo.com allege failures with power steering from 2020.  And while Plaintiffs quote from 20 NHTSA complaints, only three of the quoted complaints pre-date the latest purchase date in this matter.  Further, of the 212 pages of complaints from NHTSA, it appears that, at most, only 26 complaints were posted in 2015 and 2016.  (*See* ECF No. 30, PageID.1396; ECF No. 32, PageID.1548).  The coloradofans.com postings are equally unavailing; though they all appear to be from 2015, none of the postings specify the year and model of the vehicles at issue.  And some of the postings are not even complaints but rather responses to other people's complaints.

Moreover, Plaintiffs must show that GM was aware of the complaints, not just that they existed.  In *Wozniak v. Ford Motor Co.*, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019), the court held that Plaintiffs' general assertions of Defendant's knowledge without alleged facts that the Defendant was even aware of the complaints "do not rise above mere speculation."  *See also Hall v. General Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *4, 7-8 (E.D. Mich. Mar. 18, 2020) (finding "allegations…too vague and pleaded at too high a level of generality to support a reasonable inference that GM had pre-sale knowledge" where GM was alleged to be made aware of some defect but not the specific defect at issue); *Gregorio v. Ford Motor Co.*, 2021 WL 778913, at *8 (E.D. Mich. Mar. 1, 2021) (holding that the mere existence of customer complaints to NHTSA is insufficient without a plausible allegation that the defendant actually saw the complaints.); *Oliver v. Funai Corp.*, 2015 WL 9304541, *4 (D.N.J. Dec. 21, 2015) ("imputing knowledge" based on "internet posting[s] would mean that virtually every consumer product company would be subject to fraud claims and extensive discovery" where any plaintiff can show that the company's "product broke once and that someone had complained about it on the internet").

In this case, Plaintiffs allege that the web forums and social media are "monitored by GM." (ECF No. 26, PageID.629).  Such an allegation, however, is speculative absent supporting facts. The Sixth Circuit in *Smith* concluded that Plaintiffs' assertion that GM reads online message boards and scours the NHTSA complaint database is "speculative absent any supporting facts" that GM engaged with or received complaints about the alleged defect.  In this case, too, supporting facts are absent. 988 F.3d at 885.  As to the NHTSA complaints, Plaintiffs allege that the complaints "are delivered to GM, reviewed by GM, and analyzed by GM's engineers."  (ECF No. 26, PageID.631).  As in *Smith*, and as discussed more fully below, this Court is similarly skeptical

that such allegations are sufficient to allege that GM was aware of the NHTSA complaints, as Plaintiffs do not allege here, in any specificity, if GM actually received these complaints, when GM may have received these complaints, and who at GM received these complaints and engaged with the complaints.  (ECF No. 26, PageID.631).

Even assuming that GM monitors NHTSA complaints, the volume of complaints about a specific issue must be "significant enough" to draw the defendant's attention.  In *Smith*, the Sixth Circuit reasoned that that the plaintiffs' assertion that GM reads online message boards and scours the NHTSA complaint database" was speculative because "a small number of complaints were "a blip on [defendant's] complaints-and-repairs radar" considering the millions of cars in use.  *Smith v. General Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (internal citation and quotation omitted); *see also Johnson*, 2021 WL 3633595, at *15.  In another case, the court reasoned that imputing knowledge of a defect based on complaints was not possible unless the complaints were "frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day.  *Roe v. Ford Motor Co.*, *(Roe I)*, No. 18-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019).

Here, Plaintiffs' allegation regarding the NHTSA complaints also fails.  Plaintiffs have provided a small sampling of complaints—at most, 26.  As in *Smith,* the Plaintiffs here have not alleged details showing that these complaints were anything more than a "blip" on GM's radar.  *Smith*, 988 F.3d at 885.  Indeed, Plaintiffs do not provide an approximate total number of complaints for the Court to make any comparative evaluation.  And they concede that there are thousands of GM Colorado and Canyons on the road.  (ECF No. 26, PageID.616).  Thus, Plaintiffs do not plausibly show that GM was aware of, or received and acknowledged, the complaints.  As

31

such, the Court finds that Plaintiffs' allegations of consumer complaints on various websites do not plausibly establish knowledge of a defective electronic power steering assist torque sensor.

b. *Pre-sale testing and validation*

Plaintiffs also allege that GM had pre-sale knowledge of the defect through "knowledge about the material, design, and manufacture of the part, pre-production testing, preproduction design failure mode analysis, [and] production design failure mode analysis."  (ECF No. 26, PageID.629).  But "generalized allegations about 'testing' and manufacturer's 'analyses,' made to support a finding of knowledge of a defect are routinely rejected in this District."  *McKee*, 376 F. Supp. 3d at 761-62.  In *McKee*, the court dismissed plaintiff's fraud claims where knowledge of the defect was based on, among other things, pre- and post-release testing, internal records of replacement parts, and the defendant's review of warranty data.  *Id.*  And in *Smith*, the court rejected as "theoretical" the results from pre-production tests, as the plaintiffs did not allege with any specificity or verification that the tests even occurred and revealed an actual safety defect. *Smith*, 988 F.3d at 885; *see also Hall v. General Motors, LLC*, 2020 WL 1285636, at *3 (E.D. Mich. Mar. 18, 2020) (dismissing fraud claim in part because "Plaintiffs have not alleged any facts about GM's pre-production testing, any particular analysis GM completed based on that testing, or GM's repair order and parts data that, if proven, would establish GM's pre-sale knowledge of the StabiliTrak Defect.")

Similarly, here, the Court is not persuaded that Plaintiffs have established these allegations beyond mere generalizations.  As in *McKee* and *Smith*, Plaintiffs do not allege any specific facts about GM's pre-sale testing procedures.  As a result, it is not clear what these procedures involve, whether the procedures covered the alleged defect at issue, when the alleged tests occurred and what, if anything, the procedures established about the alleged defect as a safety hazard.

Consequently, Plaintiffs' allegations about GM's unspecified testing and analysis of its parts are not enough to support a plausible inference that GM had pre-sale knowledge of the alleged defect.

    *c. Recalls*

Next, Plaintiffs allege pre-sale knowledge based on two prior recalls: (1) a recall of MY2015 Colorados/Canyons manufactured between the roughly two-month window of January 6, 2015 to March 17, 2015 ("Safety Recall 16V054"); and (2) a recall of 2014 – 2016 Chevrolet SS ("Safety Recall 14117") . (ECF No. 26, PageID.625–29).   The parties dispute whether the Alleged Defect at issue in this case and the power steering issues that prompted Safety Recall 16V054 (the "2016 Recall Defect") and Safety Recall 14117 (the "2014 Recall Defect") were, in fact, the same problem. (*See* ECF No. 30, PageID.1397; ECF No. 32, PageID. 1547-48).

Here, Plaintiffs identify Safety Recall 16V054 as follows:

> On January 27, 2016, GM notified the Office of Defects Investigation (ODI) that it would conduct Safety Recall 16V054 to address a loss of electric power steering caused by a poor electrical connection within the torque-sensor harness connector in 2,988 Model Year (MY) 2015 Colorado/Canyon vehicles built between January 6, 2015 and March 19, 2015. General Motors determined that a defect which relates to motor vehicle safety existed in certain 2015 Chevrolet Colorado and GMC Canyon vehicles, finding that these vehicles may experience loss of power steering assist at startup, or while driving, due to a poor electrical connection within the torque sensor cover assembly.

(ECF No. 26, PageID. 625). Plaintiffs assert that this issue extends beyond vehicles manufactured between January 6, 2015 and March 17, 2015:

> All Class Vehicles share the same dangerously defective condition that GM failed to disclose to Plaintiff, consumers, and each Class Member. General Motors previously recalled model year 2015 Chevrolet Colorado and GMC Canyon vehicles manufactured January 6, 2015, to March 17, 2015, stating that a poor electrical connection within the steering gear connector may cause a loss of power steering assist.

(ECF No. 26, PageID. 616). Plaintiffs base this allegation on the similarities in symptoms of the Alleged Defect and the 2016 Recall Defect, which include "the defective torque sensor assembly"

resulting in "a sudden loss of power steering assist[.]" (ECF No. 26, PageID. 627). Plaintiffs further identify Safety Recall 14117 as follows:

> GM similarly recalled the 2014 – 2016 Chevrolet SS for a defect in its electric power steering, which also bore a striking resemblance to the steering defect in with the Class Vehicles, including the defective torque sensor assembly . . . Corrosion of the connector between the electric power steering module and the torque sensor connector may cause a loss of electric power steering assist.

(ECF No. 26, at PageID 628). Plaintiffs assert that GM had notice of the Alleged Defect derived from "prior recalls including those detailed above relating to electronic power steering parts including the torque sensor." (ECF No. 26, at PageID 629).

However, the existence of prior similar recalls is not sufficient to demonstrate that GM had knowledge of the Alleged Defect. Rather, Plaintiffs have only demonstrated that the symptoms of the 2014 and 2016 Recall Defects and the symptoms of the Alleged Defect are similar – that they result in the loss of power steering. The Amended Complaint does not include particular facts that indicate that GM *knew* the 2014 and 2016 Recall Defects extended to vehicles outside of the scope of the recalls.

Plaintiffs needed to allege "specific facts showing the manufacturer's knowledge of the defect that it allegedly fraudulently concealed." *Smith*, 988 F.3d at 886. "Mere assertions" that GM "could have theoretically known" about the Alleged Defect is not enough. *Id*. at 884. In *Smith*, the Sixth Circuit emphasized that allegations of theoretical knowledge of a manufacturer "without accompanying verification[,]" such as "data obtained by GM or documents confirming or suggesting whether the defect became known[,]" are not sufficient to survive a motion to dismiss. *Id*. at 884-86.

With more supporting factual allegations, a prior similar defect can be evidence of a manufacturer's pre-sale knowledge of a defect. The Central District of California analyzed the

34

issue in *McCarthy v. Toyota Motor Corp.,* 2019 WL 3220579, at *4 (C.D. Cal. Apr. 9, 2019) and

denied the defendant's motion to dismiss because:

> Plaintiffs allege that Toyota knew of the IPM defect in 2005 (well before the 2010-2014 Priuses at issue were sold) after it boosted the converter in the Highlander/RX400 hybrids from 500 to 650 volts. Plaintiffs claim that Toyota knew that boosting the converter in the Highlander/RX400 hybrids caused thermal stress within the IPM. Specifically, Toyota allegedly discovered that heat fluctuations can crack the solder that attaches the transistors to the IPM control board, and that cracks in the solder leave air voids that reduce the ability to dissipate heat, which damages the transistors and causes the IPM to malfunction and fail. Plaintiffs allege that Toyota – knowing that increasing the voltage from 500 to 650 in the converters caused a defect in the Highlander/RX400 hybrids – decided nonetheless to increase the voltage in 2010-2014 Priuses in the same way. *Thus, under Plaintiffs' theory, the increased voltage in the converters is the cause of the IPM defect, and because Toyota was aware of the problems that arose from increasing the voltage in other vehicles, it was aware of the defect in the Priuses at issue here prior to their sale.*
> . . .
>
> Plaintiffs have alleged that boosting the converter from 500 to 650 volts *caused* the IPM defect, and that Toyota knew of this defect when it decided to boost the converter in the 2010-2014 Priuses. Whether the true cause of the defect was the lead soldering is a factual issue the Court cannot resolve at this stage.

2019 WL 3220579, at *4 (emphasis added). In short, the *McCarthy* court held that the plaintiffs

sufficiently alleged pre-sale knowledge because plaintiffs alleged that Toyota knew of a problem

that caused a prior defect and still decided to implement that same problem again in a different

vehicle, which caused the alleged defect in that case. This is not what Plaintiffs have alleged here.

Instead, Plaintiffs have merely alleged that the symptoms of the Alleged Defect and the 2014 and

2016 Recall Defects are similar. (ECF No. 26, at PageID 629).

As the Sixth Circuit explained in *Smith*, Plaintiffs needed to "'state with particularity'

factual allegations supporting the assertion that GM knew about [the Defect]. But Plaintiffs'

allegations merely identify [the Defect] and say that the manufacturer could have theoretically

known about the flaw. And that is not enough." 988 F.3d at 885. Plaintiffs' factual allegations fail

to plausibly support their assertion that GM knew of the Alleged Defect from Safety Recall 16V054 and Safety Recall 14117. "To support such a claim, a complaint must contain specific facts showing the manufacturer's knowledge of the defect that it allegedly fraudulently concealed." *Id*. at 886. Mere speculations are not sufficient to survive a motion to dismiss. *Id*. at 884.

In sum, Plaintiffs do not meet their Rule 9(b) particularly requirements, as the allegations made in this case do not support a plausible inference that GM had pre-sale knowledge of the alleged defect.   Therefore, the Court GRANTS Defendant's motion as to Plaintiffs' claim for fraudulent concealment and claims under various state consumer protection laws, and the Court GRANTS GM's motion as to Plaintiffs' fraud-based claims and DISMISSES Counts 6 and 8-18.

## CONCLUSION

For the reasons set forth above, GM's motion to dismiss (ECF No. 30) is **GRANTED** and the Court DISMISSES this action.

**IT IS SO ORDERED.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: August 26, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 26, 2022, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager